**William MILLARD and Marjorie**
**Millard, Plaintiffs/Appellants,**

v.

**Joseph A. CORRADO, M.D.,**
**Defendant/Respondent.**

**No. ED 75420.**

Missouri Court of Appeals,
Eastern District,
Division Two.

Dec. 14, 1999.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 22, 2000.

Application for Transfer Denied
April 25, 2000.

Stephen F. Meyerkord, Casey & Meyerkord, St. Louis, Mark A. Stephens, Esq., Aurora, Evan A. Douthit, Timothy S. Frets, R. Douglas Gentile, Douthit Frets Rouse & Gentile, L.L.C., Kansas City, for Plaintiffs/Appellants William Millard and Marjorie Millard.

Robert A. Wulff, Scott J. Dickenson, Amelung, Wulff & Willenbrock, P.C., St. Louis, for Defendant/Respondent Joseph A. Corrado, M.D.

Missouri Association of Trial Attorneys, Robert M.N. Palmer, Esq., Law Offices of Robert Palmer, Springfield, Amicus Curiae In Support of Plaintiffs/Appellants.

Missouri Organization of Defense Lawyers, Louis J. Leonatti, Randall P. Baker, Leonatti & Baker, P.C., Mexico, Mo, Missouri State Medical Association, Duane E. Schreimann, Patricia D. Perkins, Hendren and Andrae, L.L.C., Jefferson City, Amicus Curiae Brief in Support of Defendant/Respondent.

## *OPINION*

JAMES R. DOWD, Presiding Judge.

Plaintiffs William and Marjorie Millard appeal from the trial court's grant of summary judgment in favor of defendant Dr. Joseph Corrado in their negligence action. Plaintiffs claim the trial court erred in concluding that plaintiffs could not maintain a general negligence claim against Dr. Corrado absent a physician-patient relationship. We reverse and remand.

### FACTS

Dr. Joseph Corrado is a general surgeon with active staff privileges at Audrain Medical Center ("AMC") in Mexico, Missouri. On the morning of November 5, 1994, Dr. Corrado was preparing to attend a meeting of the Missouri chapter of the American College of Surgeons in Columbia, Missouri. Several days earlier, Dr. Corrado had filled out the "Surgeon On Call Schedule" for November. Although aware of the upcoming American College of Surgeons meeting, Dr. Corrado scheduled himself as "on call" for that day, presumably because the other two general surgeons on AMC's staff would be on vacation that day. Before leaving AMC for his meeting, Dr. Corrado asked Dr. Ben Jolly if he would cover for Dr. Corrado's calls during the four-hour period he would be out of town. Dr. Jolly agreed to "fill in" for Dr. Corrado even though his training was in orthopedic surgery and he did not have privileges to perform general surgery. Dr. Corrado then left the hospital and drove to Columbia. Dr. Corrado notified no one else at AMC that he would be out of town and would therefore be unable to provide hands-on care to emergency room patients requiring a general surgeon.

Later that morning, Marjorie Millard was involved in an automobile accident in Callaway County, Missouri, near the intersection of Highway 54 and Interstate 70. Mrs. Millard suffered serious trauma, including broken ribs, a ruptured diaphragm, and injuries to her renal vein and artery and her adrenal artery. These injuries produced severe internal bleeding, and she quickly developed hypovolemic shock. At the time of the accident, Mrs. Millard was sixty-three years old.

The accident occurred approximately fourteen miles from Audrain Medical Cen-

ter and twenty-five miles from the University of Missouri Medical Center located in Columbia, Missouri. A Callaway County ambulance arrived at the scene at 10:28 a.m. When the EMTs commenced treatment, Mrs. Millard had no measurable blood pressure or radial pulse. Her skin was pale, cold and moist. At the time of the accident, AMC held itself out as maintaining a twenty-four hour emergency room with an emergency physician "in house" and a general surgeon "on call" and with equipment to handle surgical trauma patients on an emergency basis. The EMTs elected to transport Mrs. Millard to AMC based on its proximity to the accident and on the belief that AMC operated a twenty-four hour emergency department and therefore would have a general surgeon "on call." The ambulance left the accident scene at 10:49 a.m. The EMTs radioed AMC's emergency department that they would be arriving with a "Class 1" patient—a patient in a critical or life-threatening condition—who was involved in an automobile accident. AMC did not respond to this message.

The ambulance arrived at AMC at 11:07 a.m. where Mrs. Millard received the following treatment: IV fluids were administered and a chest x-ray was done which indicated a reduced lung volume and an increased density of the left hemithorax. This was apparently caused by layering fluid collection. At 11:45 a.m., EMT Gregory Weaver paged Dr. Corrado because he was the general surgeon listed on the call roster, but the page went unanswered. Nine minutes later, Dr. Steve Taylor, the emergency room physician, examined Mrs. Millard and diagnosed her as having an intra-abdominal bleed. Dr. Corrado was paged a second time at 11:55 a.m. Again, Dr. Corrado did not respond.

At approximately 12:00 p.m., AMC personnel attempted to arrange for air transport of Mrs. Millard to the University of Missouri Medical Center, but it was soon learned that the EMS helicopter was grounded due to inclement weather. At 12:08 p.m., Dr. Thomas Welsh and Dr. Jolly entered the emergency department at AMC after completing their rounds. Dr. Welsh and Dr. Jolly evaluated Mrs. Millard and concurred with Dr. Taylor's diagnosis that Mrs. Millard was bleeding internally and needed surgery. Dr. Welsh and Dr. Jolly were not qualified as general surgeons and could not perform this type of surgery. In addition, neither Dr. Welsh or Dr. Jolly had hospital privileges which would permit them to perform this type of surgery.

At 12:23 p.m., Dr. Corrado called the emergency department in response to the pages and spoke with Dr. Welsh. The patient history report prepared by Dr. Welsh provides the following relevant account of the conversation:

> We did contact Dr. Corrado by phone. The situation was discussed and the options addressed. It was felt that in view of the extent and nature of the patient's injury, [Mrs. Millard] would be best served by transfer to the University of Missouri Medical Center, where a trauma team was available. It was not felt to be prudent to attempt to care for her at Audrain Medical Center.

Dr. Corrado testified that he was told that AMC had a patient with some intra-abdominal injuries and that the patient was going to be transferred to the University of Missouri Medical Center. After the conversation, Dr. Taylor arranged for Mrs. Millard to be transferred to the University of Missouri Medical Center where a general surgeon would be available to care for her. Her ambulance arrived at the University of Missouri Medical Center at 1:45 p.m. Dr. Roger Huckfeldt, a general surgeon on staff at the University of Missouri Medical Center, performed emergency surgery on Mrs. Millard at 2:15 p.m., some four hours after the accident.

Plaintiffs brought suit against Dr. Corrado alleging negligence and seeking damages for injuries suffered by Mrs. Millard, including the loss of her left kidney, gallbladder, colon and part of her small intes-

tine. Mr. Millard also filed suit for loss of consortium and medical expenses. The Third Amended Petition alleges that as a direct and proximate result of the delay in treatment caused by Dr. Corrado's absence, Mrs. Millard suffered aggravation of the injuries she sustained in the accident and additional serious injuries. Dr. Corrado filed a Motion for Summary Judgment in which he argued that he was entitled to judgment as a matter of law because plaintiffs failed to establish a physician-patient relationship, a necessary component of a medical negligence claim. The trial court granted the motion and entered judgment in favor of Dr. Corrado. Plaintiffs appeal from the judgment.

## STANDARD OF REVIEW

To establish a right to summary judgment, a "defending party" must show either: (1) facts that negate any one of the claimant's elements; (2) that the non-movant, after an adequate period of discovery, has not been able to produce and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements; or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 381 (Mo. banc 1993). Only if the movant has made a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law as provided in Rule 74.04, does the burden shift to the non-movant. *Id.* To preclude the entry of summary judgment, the non-movant must set forth specific facts, by affidavits, depositions, or otherwise, showing that there is a genuine issue for trial. *Id.* A "genuine issue" exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts. *Id.*

When reviewing a grant of summary judgment, we view the evidence in the light most favorable to the party against whom judgment was entered. *Id.* at 382. Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion and the non-movant is accorded the benefit of all reasonable inferences from the record. *Id.*

## ANALYSIS

■ Before addressing the points raised in plaintiffs' brief, we must consider Dr. Corrado's motion to strike taken with the case. Dr. Corrado moves to strike two footnotes from plaintiffs' reply brief which reference depositions taken after the trial court's entry of summary judgment. Plaintiffs concede that these footnotes refer to depositions taken after the entry of summary judgment. Because these depositions were not made part of the summary judgment record and therefore were not before the trial court, consideration of the depositions on appeal would be improper. *See Hill v. Air Shields, Inc.,* 721 S.W.2d 112, 116 (Mo.App. E.D.1986). Accordingly, Dr. Corrado's motion is granted and we do not consider these materials in deciding the issues in this case..

I. General Negligence

■ Plaintiffs claim the trial court erred in finding that Dr. Corrado could not be held liable for general negligence because he owed no duty of care to Mrs. Millard absent a physician-patient relationship. The trial court concluded that Mrs. Millard could not submit a claim against Dr. Corrado for general negligence because "the specific acts and omissions alleged by plaintiff on the part of Carrado [sic] all necessarily involve a matter of medical science or art requiring special skills not ordinarily possessed by lay persons."

■ In most cases of medical negligence or malpractice a physician's duty to a patient is derived from the physician-patient

relationship. *Richardson v. Rohrbaugh,* 857 S.W.2d 415, 417–18 (Mo.App. E.D. 1993). However, when the physician's allegedly negligent acts or omissions do not involve a matter of medical science, a duty may also exist when public policy favors the recognition of a duty or when the harm is particularly foreseeable.

## A. Public Policy Considerations

In determining whether public policy supports the recognition of a duty in this case, we are guided by *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc.,* 700 S.W.2d 426, 432 (Mo. banc 1985). In *Hoover's Dairy,* the Missouri Supreme Court articulated several factors that courts should consider in deciding whether to recognize a legal duty based on public policy. These factors include: (1) the social consensus that the interest is worth protecting, (2) the foreseeability of harm and the degree of certainty that the protected person suffered the injury, (3) the moral blame society attaches to the conduct, (4) the prevention of future harm, (5) the consideration of cost and ability to spread the risk of loss, and (6) the economic burden upon the actor and the community. *Id.*

In this case we conclude that by application of the *Hoover's Dairy* factors, Dr. Corrado owed a duty of care to Mrs. Millard. A regulation adopted by the General Assembly in 1996 requires "on call" emergency room physicians to arrive at the hospital within thirty minutes.[1] This regulation evidences a social consensus to ensure that emergency room physicians attend to their patients within a reasonable time, i.e. thirty minutes. That Mrs. Millard's injuries preceded the adoption of this regulation does not mean that this social consensus did not exist at the time of the accident. Indeed, the legislature is a political body that acts in large part in response to existing public sentiment. In addition, the record shows that at the time of the accident, AMC expected "on call" physicians to respond to calls within thirty minutes. It was also reasonably foreseeable that AMC would be presented with a patient requiring the care of a general surgeon during Dr. Corrado's absence.

Imposing a duty on "on call" physicians to notify appropriate hospital personnel of their unavailability does not place an unreasonable burden on the medical profession. Here, a mere phone call would have significantly reduced the four-hour period between the accident and Mrs. Millard's life-saving surgery. Whatever slight inconvenience may be associated with notifying the hospital of the on-call physician's availability is trivial when compared with the substantial risk to emergency patients absent any notice requirement. Finally, if "on call" physicians have a duty to give notice when they cannot fulfill their "on call" responsibilities, the chances of similar incidents occurring in the future will be reduced.

## B. Foreseeability of Harm

If the harm is particularly foreseeable, a duty will be recognized. The touchstone for the creation of a duty is foreseeability. *Madden v. C & K Barbecue Carryout, Inc.,* 758 S.W.2d 59, 62 (Mo. banc 1988). A duty of care arises out of circumstances in which there is a foreseeable likelihood that particular acts or omissions will cause harm or injury. *Id.* If, under the circumstances, a reasonably prudent person would have anticipated danger and provided against it, courts will recognize a legal duty to prevent harm. *Geiger v. Bowersox,* 974 S.W.2d 513, 516 (Mo.App. E.D.1998).

The risk of harm to which Mrs. Millard was exposed due to Dr. Corrado's failure to notify AMC of his unavailability was reasonably foreseeable. When Dr. Corra-

---

1. This regulation sets forth a "standard of care" for emergency room personnel and provides in pertinent part: "[t]he surgeon who is on call for emergency surgical cases shall arrive at the hospital within thirty (30) minutes of being summoned." 19 C.S.R. 30–20.021(3)(C)(5).

do decided to attend the American College of Surgeons' meeting, he knew AMC would have no general surgeon "on call" during his absence. Dr. Corrado's attempt to delegate his "on call" responsibilities to Dr. Jolly, an orthopedist, was conclusively ineffective because AMC had not granted Dr. Jolly privileges to perform general surgery. According to Dr. Jolly's testimony, he would have to "send" any patients needing the care of a general surgeon to another hospital. At the very least, Dr. Corrado's failure to notify the hospital staff of his unavailability created a false security that a general surgeon would be available to treat emergency patients requiring a general surgeon within a reasonable time at AMC. As a result of Dr. Corrado's failure to notify AMC of his absence, AMC did not radio the ambulance that it did not have a general surgeon available and valuable time was lost attempting to contact Dr. Corrado, all of which significantly delayed Mrs. Millard's receiving the care of a general surgeon. Under these circumstances, it is apparent a reasonably prudent person should have foreseen that such conduct would create a substantial risk of harm to emergency room patients like Mrs. Millard.

## C. Application of These Principles

■ Applying these principles to the present case, we hold that the public policy of Missouri and the foreseeability of harm to patients in the position of Mrs. Millard support the recognition of a duty flowing from Dr. Corrado to Mrs. Millard. Accordingly, we hold that "on call" physicians owe a duty to reasonably foreseeable emergency patients to provide reasonable notice to appropriate hospital personnel when they will be unavailable to respond to calls. This duty exists independently of any duties flowing from a physician-patient relationship. Physicians who cannot fulfill their "on call" responsibilities must provide notice as soon as practicable once they learn of circumstances that will render them unavailable.

In reaching our conclusion, we are mindful of concerns raised by Dr. Corrado and the amici, in particular the fear that recognizing such a duty will prompt fewer physicians to accept "on call" assignments. This fear, however, is unwarranted. Unless obligated by law or contract, physicians are not required to accept "on call" assignments, and our holding does not alter this principle. While emergency patients may expect that a qualified physician will care for them, this expectation alone does not create a duty on the part of an identifiable physician. The duty is created by the physician who agrees to be available without reservation to treat emergency patients. We are aware of no public interest that is furthered by permitting "on call" physicians to leave town without providing adequate notice that they will be unable to respond to calls. In short, the duty we establish in this case will not have a detrimental impact on the ability of hospitals to attract physicians to accept "on call" assignments.

The concurring opinion provides additional insight and authority for our conclusion that a claim for general negligence should be recognized in Missouri in the context of this case. The opinion cites the Restatement (Second) of Torts, Section 324A in support of plaintiffs' general negligence claim. While there is no Missouri case law in which Section 324A has been applied in a medical negligence setting, we agree that the Restatement is consistent with our conclusion in this case. Indeed, other jurisdictions have seen fit to apply Section 324A in the context of medical negligence and create the duty as the majority has here—through application of the foundational principles of foreseeability and public policy which apply to all duties rooted in negligence. *See DiMarco v. Lynch Homes–Chester County, Inc.*, 384 Pa.Super. 463, 559 A.2d 530 (1989); *Troxel v. A.I. Dupont Institute*, 450 Pa.Super. 71, 675 A.2d 314 (1996); *Ellis v. Peter*, 627 N.Y.S.2d 707, 211 A.D.2d 353 (1995); *Mil-*

*ler v. Rivard*, 585 N.Y.S.2d 523, 180 A.D.2d 331 (1992).

## II. Medical Negligence

■ The trial court also granted defendant's Motion for Summary Judgment because it found there was no genuine issue of material fact as to whether a physician-patient relationship existed between Mrs. Millard and Dr. Corrado. In support of its conclusion, the trial court made the following recitals in footnote 2 of its Order and Judgment:

Corrado was not present at the hospital when Plaintiff was brought in on November 5, 1994; (2) Corrado was in Columbia, Missouri at the time, attending a Missouri College of Surgeons meeting of which he is allegedly president; (3) Corrado did not provide any care or treatment to Plaintiff the entire time she was at Audrain hospital on November 5, 1994; (4) Corrado did not provide a consultation or offer any advice or opinion as to her care and treatment while she was at Audrain Hospital, and (5) Corrado was unaware Plaintiff had been taken to Audrain Hospital until she had already been sent to the University of Missouri Hospital for further care and treatment.

Plaintiffs agree with the trial court's first two statements that Dr. Corrado was not present at AMC and that he was in Columbia. However, plaintiffs contend there are numerous evidentiary facts ignored by the trial court in reaching the conclusions in the third, fourth and fifth statements contained in the footnote. On appeal, plaintiffs contend that the trial court erred because a genuine issue of material fact exists as to whether a physician-patient relationship was created because of Dr. Corrado's status as the "on call" general surgeon, AMC staff bylaws, and the conversation between Dr. Corrado and Dr. Welsh.

■ A physician-patient relationship is essential to a claim for medical malpractice. *Richardson v. Rohrbaugh*, 857 S.W.2d 415, 417–18 (Mo.App. E.D.1993). Absent a physician-patient relationship, no duty exists and a medical malpractice claim must fail. *Corbet v. McKinney*, 980 S.W.2d 166, 169 (Mo.App. E.D.1998). The law defines a physician-patient relationship as a consensual relationship where the patient or someone acting on the patient's behalf knowingly employs a physician who consents to treat the patient. *Id.* Generally, a physician-patient relationship is created only where the physician personally examines the patient. Louisell & Williams, *Medical Malpractice* sec. 8.03, at 8–19 to –20 (1998). However, under certain circumstances, courts have recognized a physician-patient relationship in the absence of any personal contact between the physician and patient. *See, e.g., McKinney v. Schlatter*, 118 Ohio App.3d 328, 692 N.E.2d 1045, 1050–51 (1997) (finding a physician-patient relationship between an emergency room patient and an "on call" physician who had been consulted by the emergency room physician over the telephone and participated in the diagnosis and treatment of the patient); *Hand v. Tavera*, 864 S.W.2d 678, 680 (Tex.App. 1993) (holding that hospital's contract with a health care plan and a physician's contract with the hospital created a physician-patient relationship even though physician had no personal contact with patient); *and Fought v. Solce*, 821 S.W.2d 218, 220 (Tex. App.1991) (finding that contractual obligation conditioning staff privileges on duty to be "on call" may give rise to physician-patient relationship).

■ This court recently discussed the requirements for establishing a physician-patient relationship when the physician has no personal contact with the patient. *Corbet v. McKinney*, 980 S.W.2d 166 (Mo. App. E.D.1998). In *Corbet*, the emergency room physician treating the patient consulted a specialist by telephone and presented the patient's case by relaying her medical condition as set forth on the medical chart. After extensively reviewing the

law of other jurisdictions, the court articulated the following test to determine whether a physician-patient relationship exists between a patient and a consultant physician: "[w]here the consultant physician does not physically examine or bill the patient, a physician-patient relationship can still arise where the physician is contractually obligated to provide assistance in the patient's diagnosis or treatment and does so." *Id.* at 169. On the specific facts of the case, the *Corbet* court held that no physician-patient relationship existed because the consulted physician did not diagnose or treat the patient, and did not contract with either the patient, the emergency room physician, or the hospital to provide medical services.

In the present case, neither party contends that Dr. Corrado provided any "hands-on" treatment to Mrs. Millard. Because the trial court granted summary judgment to Dr. Corrado on the medical negligence claim on the ground that no physician-patient relationship existed, we must apply the *Corbet* test to determine if the evidence presented to the trial court created a genuine issue of material fact.

Dr. Corrado did not address the existence of a contractual obligation to treat Mrs. Millard or other emergency patients in his motion. Therefore, we consider Mrs. Millard's evidence as uncontested on this issue. In her response, Mrs. Millard presented evidence to support finding a contractual obligation on the part of Dr. Corrado to respond to calls within thirty minutes, as now required by 19 C.S.R. 30–20.021(3)(C)(5). Specifically, the response details AMC staff bylaws relating to on-call physician responsibilities, deposition testimony from AMC's CEO Richard Jansen and other hospital personnel indicating such a duty. Mr. Jansen testified as follows:

Q. When somebody like Dr. Corrado is listed as the on call general surgeon, what does that mean?

A. It meant we could reasonably expect that Dr. Corrado would be available within a reasonable time to respond to emergencies.

Q. And what do you mean by a reasonable time to respond to an emergency?

A. Oh, I would—I would consider a reasonable time approximately thirty minutes.

In addition, Dr. Jolly testified in his deposition as follows:

Q. What is your understanding as to the requirements of response time for the on-call general surgeon?

A. I believe the response time is twenty minutes. I am not absolutely sure on that; twenty to thirty minutes is what I am lead to believe.

Q. And is it the hospital's policy now, and was it in November, '94, that around the clock, twenty-four hours a day, an on-call general surgeon should be within twenty to thirty minutes of the hospital when called?

A. That's the recommendation, yes.

Mrs. Millard argues that Dr. Corrado's failure to respond to his pages amounts to a refusal to treat her which is prohibited by AMC's bylaws. Other jurisdictions have relied on hospital bylaws to impose a duty to treat. *Hiser v. Randolph*, 126 Ariz. 608, 617 P.2d 774 (1980). After examining the section of the bylaws before the trial court and the testimony of Richard Jansen we conclude that, absent contrary evidence, Mrs. Millard is entitled to the reasonable inference that AMC contracted with Dr. Corrado to treat all general surgery patients who presented to the emergency room.

In his Motion for Summary Judgment, Dr. Corrado argues that no physician-patient relationship existed because of four facts: (1) that Dr. Corrado was attending a meeting in Columbia, Missouri when Mrs. Millard was brought to AMC; (2) that Dr. Jolly was the "on call" physician for Dr. Corrado at the time; (3) that Dr. Corrado did not provide any care or treat-

ment to Mrs. Millard; and (4) that Dr. Corrado did not provide any consultation regarding the care or treatment of Mrs. Millard. In support of the claim that Dr. Corrado provided no care or treatment, the motion cites AMC's emergency room records, Dr. Jolly's deposition, and his own deposition. The emergency room records are presumably relevant to show that Dr. Corrado did not render any "hands on" treatment, a point with which plaintiffs agree. The portion of Dr. Jolly's deposition which Dr. Corrado relies upon indicates that Dr. Jolly did not talk with Dr. Corrado by phone while Mrs. Millard was at AMC. The cited portion of Dr. Corrado's deposition simply reiterates that Dr. Corrado was attending a surgeons' meeting in Columbia, Missouri.

Plaintiffs point to contrary evidence, citing Dr. Welsh's patient history report and his deposition testimony as evidence that Dr. Corrado did participate in the treatment of Mrs. Millard. Mrs. Millard contends that Dr. Corrado consulted with Drs. Welsh and Jolly on the phone while Mrs. Millard was still at AMC. Plaintiffs also assert that Dr. Corrado participated in the diagnosis of Mrs. Millard's condition and the decision to transfer her to the University of Missouri Medical Center. Dr. Welsh's report reads as follows:

> This is a 63 year old White female who was brought into the Emergency Room after an automobile accident. I was asked to see the patient at Dr. Taylor's request, who was manning the Emergency Room. I also contacted Dr. Jolly, who was covering for Dr. Corrado at that time of that initial phone call. Dr. Jolly and I came to. the Emergency Room shortly after noon. Dr. Jolly examined the patient and I discussed the situation with the patient's husband. It was clear that the patient had obvious problems with internal bleeding and abnormal chest x-ray. We did contact Dr. Corrado by phone. The situation was discussed and the options addressed. It was felt that in view of the extent and nature of the patient's injury, that she would be best served by transfer to the University of Missouri Medical Center, where a trauma team was available. It was not felt to be prudent to attempt to care for her at Audrain Medical Center. With this in mind she was given IV fluids, type specific blood, and as soon as she was stable enough was transferred by ambulance to the University of Missouri Medical Center.... (Emphasis added.)

Dr. Welsh's report is corroborated by his deposition testimony.

In addition, Dr. Corrado testified at his deposition that he recalled such a phone call with either Dr. Jolly or Dr. Welsh in which Mrs. Millard's status was discussed. Dr. Welsh's report and the deposition testimony of both Drs. Welsh and Corrado, when viewed in a light most favorable to plaintiffs, raise a material question of fact regarding the extent of Dr. Corrado's participation in Mrs. Millard's treatment that day. On this record a jury could find that Dr. Corrado made or participated in making the decision to transfer Mrs. Millard to the University of Missouri Medical Center and that, in coming to such a decision, Dr. Corrado relied on his skill and training as a general surgeon. This evidence indicates that the trial court's fourth recital— "Corrado did not provide a consultation or offer any advice as to [Mrs.Millard's] care and treatment while she was at Audrain Hospital"—is subject to dispute.

Furthermore, the trial court's fifth recital in the footnote—"Corrado was unaware Plaintiff had been taken to Audrain Hospital until she had already been sent to the University of Missouri Hospital for further care and treatment"—is also contradicted by the evidence in the record. Dr. Corrado testified as follows:

> I only recollect that there was a call, and they told me that they had a patient that they thought probably had some intra-abdominal injuries .... and they were going to, you know, transfer them to the

University. And I said, "That's what I would do."

Dr. Corrado's deposition testimony suggests Mrs. Millard was still present at Audrain when Dr. Corrado spoke to the other doctors and that, contrary to the trial court's recitals, Dr. Corrado's own testimony was that he was aware of her presence at Audrain before she was transferred. These disputed facts were apparently overlooked by the trial court and make summary judgment in this case an inappropriate remedy.

 We find that Plaintiffs adequately pleaded both a general negligence claim and a medical negligence claim. Count V of plaintiffs' petition states:

> 64. Defendant CORRADO had a duty to possess and use that degree of skill and learning ordinarily used under the same or similar circumstances by members of his profession. Defendant CORRADO breached his duty and was guilty of the following acts of negligence and carelessness by failing to measure up to the standards of due care, skill and practice required by members of his profession . . .

This paragraph sufficiently advised Dr. Corrado of Mrs. Millard's medical negligence claim so that he could prepare a defense. While the heart of both the general negligence claim and the medical negligence claim is Dr. Corrado's failure to provide hands-on treatment in the form of emergency surgery, the general negligence claim does not make the medical negligence claim irrelevant. Rule 55.10 states that a plaintiff may include more than one claim in a single count. "A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. . . . A party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal or equitable grounds."

While plaintiffs' pleadings in Count V of the petition are subject to criticism, Rule 55.33(a) and (b) affords the parties the right to move to amend the pleadings before trial or amend the pleadings to conform to the evidence presented at the close of all evidence. Because a motion for summary judgment does not attack the pleadings we should not address the pleadings at this early stage on our own motion.

 The tortious conduct that forms the essence of both claims was Dr. Corrado's failure to perform emergency surgery. We are unable to find any case law which indicates that the conduct giving rise to a physician-patient relationship must be the same conduct that causes the plaintiff's injury. Dr. Corrado's failure to be present to treat Mrs. Millard was an ongoing tort. His duty to her arose upon her admission into the emergency room and continued until she received the emergency surgery she needed. The recent Missouri Supreme Court case of *Weiss v. Rojanasathit* makes very clear that the duty to attend the patient continues unless the physician-patient relationship is ended by (1) the mutual consent of the parties, (2) the physician's withdrawal after reasonable notice, (3) the dismissal of the physician by the patient, or (4) *the cessation of the necessity that gave rise to the relationship. Weiss v. Rojanasathit*, 975 S.W.2d 113, 119–120 (Mo. banc 1998). Once a physician-patient relationship is established, the physician is bound to fulfill his duty until it terminates pursuant to *Weiss*. In the present case, the necessity for Mrs. Millard's emergency surgery ceased when she received that surgery at the University of Missouri Medical Center more than three hours after her arrival at AMC.

Because there are material questions of fact as to the existence of a physician-patient relationship in this case, we hold that the trial court erred in entering summary judgment in favor of Dr. Corrado on this issue.

## CONCLUSION

For the reasons stated, the trial court erred in concluding that: 1) plaintiffs failed to state a general negligence claim against Dr. Corrado; and 2) there was insufficient evidence of a physician-patient relationship between Mrs. Millard and Dr. Corrado. The judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

LAWRENCE G. CRAHAN, J., Concurs in Result in Separate Opinion.

RICHARD B. TEITELMAN, J., Concurs.

LAWRENCE G. CRAHAN, Judge, concurring in result.

I respectfully concur in result.

The sole issue in this appeal is whether the trial court properly rendered summary judgment on a single count of a six count petition. Although the briefs of the parties leave the somewhat confusing impression that Plaintiffs attempted to assert both a general negligence count and a medical malpractice count against Dr. Corrado, only one count of the petition pertains to Dr. Corrado.

In Count V of the petition, Plaintiffs claimed that they were injured as a direct result of the following conduct of Dr. Corrado:

a. Negligently and carelessly failing to be available and to promptly respond to the AUDRAIN emergency department's requests for consultation;

b. Negligently and carelessly failing to abide by the AUDRAIN bylaws and policies requiring him, pursuant to the call schedule he prepared, to serve as the on-call general surgeon on November 5, 1994;

c. Negligently and carelessly "signing out" his general surgery on-call obligations and responsibilities to a physician, who was not a qualified general surgeon and who lacked hospital privileges to perform general surgery, and who CORRADO did not expect to perform general surgery procedures such as the kind required by plaintiff;

d. Negligently and carelessly failing to notify AUDRAIN and its emergency department personnel that he would not be fulfilling his on-call general surgery responsibilities or that Dr. Jolly would be "covering" for him.

In the trial court, Defendant prevailed on the ground that the undisputed facts established that there was no physician-patient relationship. Plaintiff never alleged there was a physician-patient relationship, that Dr. Corrado ever treated her or that her injuries resulted from Dr. Corrado treating her or failing to treat her. She claims she was injured because Dr. Corrado's conduct in the particulars set forth above caused her to be transported to a hospital that wasn't equipped to treat her severe injuries instead of being transported to an almost equidistant hospital that was fully equipped to treat her, thus delaying treatment for several hours and exacerbating her injuries.

Although Plaintiffs urge on appeal that Defendant did not conclusively establish the absence of a physician-patient relationship due to an arguable conflict in the evidence over whether Dr. Corrado spoke to Dr. Jolly or Dr. Welsh before Mrs. Millard was transported to the University of Missouri Medical Center, the point is essentially irrelevant. In their petition, Plaintiffs do not claim that the decision to transport Mrs. Millard to the University of Missouri Medical Center was negligent. Thus, whether Dr. Corrado did or did not participate in that decision is essentially irrelevant because Plaintiffs do not contend that such "treatment," if it occurred, caused her any injury.

Plaintiffs have, however, stated a claim for negligence against Dr. Corrado regardless of whether there was a physician-patient relationship. Specifically, the Re-

statement (Second) of Torts, section 324A, which has been recognized and applied by Missouri Courts, provides a basis for recovery that is not dependent upon the existence of a physician-patient relationship.

The Restatement (Second) of Torts, section 324A provides in relevant part:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking if

(a) his failure to exercise reasonable care increases the risk of such harm, or . . . .

This section has been recognized as a basis for recovery under Missouri law at least since 1983. *Brown v. Michigan Millers Ins. Co. Inc.*, 665 S.W.2d 630, 632–36 (Mo.App.1983); *Bowman v. McDonald's Corp.*, 916 S.W.2d 270, 286–87 (Mo.App. 1995). It is essentially a restatement of the doctrine, long recognized in Missouri law, that a duty may be assumed or undertaken, and when so assumed, a defendant must exercise reasonable care in carrying out the duty. *Wolfmeyer v. Otis Elevator Co.*, 262 S.W.2d 18, 23 (Mo.1953).

In this case, Plaintiffs have provided evidence sufficient for a jury to find all of the elements required for recovery. It is undisputed that Dr. Corrado undertook to render service as the on-call surgeon for Audrain Hospital. The purpose of having an on-call surgeon is to protect third persons such as Mrs. Millard who may suffer serious injuries requiring prompt surgical intervention. Dr. Corrado arranged for Dr. Jolly, who was not authorized to perform general surgery, to cover for him, thus creating a foreseeable risk that a seriously injured person such as Mrs. Millard would be transported to a facility that had no one available to treat her injuries and that the resulting delay in obtaining

proper treatment would exacerbate those injuries. Although Dr. Corrado claims he notified the emergency department and the switchboard operator that he would be unavailable, the available records do not reflect such notice. Even assuming such notice was given, a jury could still find that such actions were insufficient under the circumstances. According to the Restatement (Second) of Torts, section 324A, comment b, liability may also be predicated on failure to exercise reasonable care to protect third persons upon discontinuing the undertaking. Finally, Plaintiffs produced substantial evidence that Dr. Corrado's actions resulted in a delay in obtaining treatment for her injuries, thus increasing the risk of harm. Under such circumstances, Dr. Corrado is not entitled to summary judgment and the judgment must be reversed and the cause remanded for further proceedings.