

# In the Missouri Court of Appeals
# Eastern District

## DIVISION THREE

| | | |
|---|---|---|
| JOANNE KNIGHT, | ) | No. ED112826 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of St. Charles County |
| v. | ) | Cause No. 2111-CC00741 |
| | ) | |
| HUILIN LI, M.D., | ) | Honorable Michael J. Fagras |
| SAM BISHARA, M.D., and | ) | |
| ST. LOUIS CARDIOLOGY | ) | |
| CONSULTANTS, LTD., | ) | |
| | ) | |
| Respondents. | ) | Filed: February 18, 2025 |

## Introduction

Appellant Joanne Knight appeals the trial court's grant of summary judgment in favor of Respondent Dr. Huilin Li and Respondents Dr. Sam Bishara and St. Louis Cardiologist Consultants, Ltd. ("SLCC"), as well as the trial court's grant of Dr. Li's motion to strike and exclude the standard of care opinions of Appellant's retained expert witness. We reverse and remand.

## Background

Appellant's Husband, Decedent, arrived by ambulance to the emergency department at SSM St. Joseph Hospital-Lake St. Louis at 2 PM on January 21, 2020. Decedent had a history of hypertension and had collapsed earlier in the day due to severe shortness of breath. Decedent

reported that he had been experiencing shortness of breath for about six weeks, but that it had worsened over the last week and he was no longer able to lie flat on his back due to his inability to breathe. Decedent's initial tests to evaluate his cardiac condition, including an EKG and troponin test, were determined to be abnormal and the emergency department doctor diagnosed Decedent with "acute congestive heart failure."

The emergency department doctor further ordered a cardiology consultation. A unit secretary in the emergency department subsequently contacted SLCC, a medical group contracted to provide cardiology consultations to SSM St. Joseph and spoke with the nurse practitioner on duty, NP T.T., regarding Decedent around 3:35 PM. At that time, NP T.T. accepted Decedent as a patient on behalf of Dr. Bishara and SLCC. NP T.T. testified that she was authorized to accept such consultations. Decedent's electronic medical records from the Epic system used by SSM St. Joseph show Dr. Bishara was thereafter listed as a consulting physician for cardiovascular disease on Decedent's treatment team. The records further show that NP T.T. briefly reviewed Decedent's records around 4:30 PM that afternoon.

Decedent was admitted to SSM St. Joseph by NP L.N. at 4:54 PM. Decedent's electronic medical records show that NP L.N. spoke with the emergency department doctor regarding Decedent's case and need for further evaluation, and that NP L.N. agreed to accept Decedent as a patient on behalf of Dr. Li, who was one of her supervising physicians under her collaborative practice agreement, at that time. NP L.N. testified that an attending physician was required to be assigned to the patient at the time of admission, and that she assigned Dr. Li as an attending because Dr. Li was set to come on shift at 7 PM that evening. Decedent's medical records show Dr. Li as both admitting and attending physician. Because NP L.N.'s shift ended at 5 PM, she directed NP S.S. to prepare the "admission note" or the "history and physical exam note," which

2

generally involved seeing the patient, discussing the reasons for admissions, reviewing tests, and developing a plan of care. NP S.S. entered Dr. Li as the attending physician at 5:54 PM, started her admission note at 6:24 PM, and saw Decedent in the emergency department at 7:15 PM.

Decedent was taken to his room around 8:05 PM. Decedent subsequently suffered a cardiac arrest at 9:54 PM, at which point a code blue was called. Decedent was pronounced dead at 10:21 PM. Neither Dr. Li nor Dr. Bishara saw Decedent prior to his cardiac arrest.

Appellant filed a wrongful death claim and named as defendants Dr. Li, Dr. Bishara, and SLCC, along with Dr. L.C., another consultant with SLCC who was voluntarily dismissed, and SSM Health Care, who was granted summary judgment on the basis that Appellant's claims only implicate SSM Health Care on an agency theory relating to Dr. Li and various nurse practitioners, which Missouri courts no longer recognize as a cognizable claim.

During his deposition, Dr. Li testified that he was not made aware of Decedent as a patient by either the emergency room doctor or any of the nurse practitioners, nor was he aware that Decedent had been assigned to him as a patient prior to responding to the code blue shortly before 10 PM. However, Dr. Li testified that Decedent was his responsibility when he came on shift that evening at 7 PM because he was listed as the admitting physician in Decedent's records.[1] Furthermore, Dr. Li confirmed that NP L.N. was permitted to accept patients on his behalf under her collaborative practice agreement. When asked at what point after he started his shift was it his responsibility to look at Decedent's chart, Dr. Li responded that he did not look at Decedent's chart because he did not know about the admission due to not being on shift when the admission occurred and the emergency department doctor not informing him of the

---

[1] We note that decedent's medical records show Dr. Li referred to both as admitting and attending physician, and various witnesses refer to him as both with no discernible differences between the terms.

admission. Dr. Li further testified that it was the procedure at SSM St. Joseph for the nurse practitioners, who change shift at 5 PM, to hand off patients, and then for the incoming nurse practitioner to speak to the incoming physician regarding patients after the doctor shift change at 7 PM. Dr. Li testified that NP S.S. never spoke to him about Decedent.

Appellant retained Expert as an expert witness on standard of care relating to the claims against Dr. Li. Expert is board certified in internal medicine and a hospitalist with over thirteen years of experience. At his deposition, Expert testified that the standard of care required physicians to review patient records and see patients within approximately an hour of beginning their shifts. Expert testified that Dr. Li had a duty to learn of Decedent's designation as a patient and see Decedent within a reasonable amount of time from the start of his shift at 7 PM, and that any reasonable doctor would have known about Decedent's status as a patient prior to the code blue at 9:54 PM that evening. Expert explained that Dr. Li should have reviewed his patient list when he started his shift, which would have been available to him on his Epic system login, at which point he would have become aware of Decedent and seen the need for an urgent cardiology consultation due to Decedent's test results. Expert testified that Dr. Li's designation as an attending physician means he was "in charge" of any patients assigned to him, and that the standard of care requires hospitalists such as Dr. Li to know of any patients he has been assigned, and that such duty cannot be abdicated.

Respondent Dr. Li filed a motion to strike and exclude Expert's standard of care opinions on the basis that Expert's opinion equated to mere speculation and conjecture, specifically that Expert's opinion that Dr. Li could have used the Epic System to inform himself of Decedent's designation as a patient was based on merely his personal use of the Epic system. Dr. Li argued that Expert's opinion therefore did not meet the standard set by Section 490.065.2 and the

4

Daubert test for reliability because it was based on a personal opinion rather than the standard of care generally accepted in the profession. The trial court granted Dr. Li's motion to strike Expert. The trial court subsequently granted Dr. Li's motion for summary judgment on the basis that, following the strike of Expert, Appellant was unable to maintain a claim of medical malpractice absent an expert witness's testimony establishing standard of care. Dr. Bishara and SLCC also filed a motion for summary judgment alleging lack of physician-patient relationship, which the trial court granted. This appeal follows.

**Standard of Review**

"The admission or exclusion of evidence lies within the sound discretion of the [circuit] court and will not be disturbed absent clear abuse of discretion." *Sherrer v. Bos. Sci. Corp.*, 609 S.W.3d 697, 705 (Mo. banc 2020) (quoting *Cox v. Kan. City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 114 (Mo. banc 2015)). "In determining whether the trial court abused its discretion in excluding evidence, the focus is not on whether the evidence was admissible but on whether the trial court abused its discretion in excluding the evidence." *Rhoden v. Missouri Delta Med. Ctr.*, 621 S.W.3d 469, 484 (Mo. banc 2021) (quoting *Coyle v. City of St. Louis*, 408 S.W.3d 281, 289 (Mo. App. E.D. 2013)). "If reasonable persons can differ as to the propriety of the [circuit] court's action, then it cannot be said that the [circuit] court abused its discretion." *Linton by & through Linton v. Carter*, 634 S.W.3d 623, 627 (Mo. banc 2021) (quoting *In re Care & Treatment of Donaldson*, 214 S.W.3d 331, 334 (Mo. banc 2007)).

The standard of review for summary judgment is *de novo. Z.S. by & through P.S. v. Rockwood Sch. Dist.*, 674 S.W.3d 818, 820 (Mo. App. E.D. 2023) (citing *MacColl v. Mo. State Hwy. Patrol*, 665 S.W.3d 290, 294 (Mo. banc 2023) (internal quotation omitted)). "Summary judgment is only proper if the moving party establishes that there is no genuine issue as to the

material facts and that the movant is entitled to judgment as a matter of law." *Id.* (quoting

*MacColl*, 665 S.W.3d at 294). "We review the facts in the record in the light most favorable to

the non-moving party." *Id*. (quoting *Reddick v. Spring Lake Ests. Homeowner's Ass'n*, 648

S.W.3d 765, 773 (Mo. App. E.D. 2022)).

**Points I & II**

In Point I, Appellant argues that the trial court erred in granting Dr. Li's motion to strike

and exclude Expert's opinion regarding standard of care because "[Expert's] opinions were

based on sound opinions as to the duties of attending physicians and backed up by the

undisputed records of treatment." Specifically, Appellant takes issue with the trial court's finding

that Expert's opinion regarding the standard of care for when physicians should be aware of their

role in a patient's care and the timeframe for when a patient needs to be seen was not reliable

because it was based entirely on Expert's personal knowledge and use of the Epic system.

Relatedly, in her second point, Appellant alleges that the trial court erred in granting summary

judgment in favor of Dr. Li based on the lack of standard of care expert testimony following the

trial court striking of Expert because Expert was improperly struck.

"Expert testimony in civil cases is inadmissible unless it satisfies the evidentiary

requirements of section 490.065." *Carter*, 634 S.W.3d at 626. Section 490.065.2(1) states:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if:
> (a) The expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the
> case[.]

"Under section 490.065.2, trial courts must act as gatekeepers to ensure that the testimony

sought to be admitted is not only relevant, but reliable." *Gebhardt v. Am. Honda Motor Co.*, 627

6

S.W.3d 37, 44 (Mo. App. W.D. 2021) (quoting *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 700 (Mo. App. E.D. 2020)) (internal quotations omitted). While section 490.065.2 contains some enumerated considerations, the inquiry about admissibility is intended to be flexible. *Id*. The *Daubert* factors, while relevant to Missouri courts in interpreting section 490.065.2, are not controlling. *Id*.; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The *Daubert* factors allow courts to consider the following when determining if an expert's testimony is reliable:

> (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known potential error rate of the technique or theory when applied and the existence and maintenance of standards and controls; and (4) whether the technique or theory has been generally accepted in the scientific community.

*Ingham*, 608 S.W.3d at 700 (citing *Daubert*, 509 U.S. at 593-94).

> In regard to medical professionals,

> Although § 490.065.2 permits a witness to testify in the form of an opinion if qualified to do so, the opinion offered by a witness must necessarily be one within the witness's area of expertise. For this reason, this Court has held that medical professionals are not permitted to opine on all things medical simply because they are medical professionals. Rather, medical professionals, like all other experts, must be qualified by knowledge, skill, experience, training, or education to give the opinion offered.

*Moore v. Monsanto Co.*, 699 S.W.3d 516, 521–22 (Mo. App. E.D. 2024)*, transfer denied* (Nov. 19, 2024) (internal citations omitted). Additionally, the opinion must be based upon well recognized established standards of care and not upon a personal standard. *Dine v. Williams*, 830 S.W.2d 453, 457 (Mo. App. W.D. 1992).[2] An expert witness's opinion must have a rational basis and be founded on substantial information, not mere conjecture or speculation. *Huett v. Branson*,

---

[2] Expert testimony regarding appropriate standard of care is generally required in medical malpractice claims. *Denney v. Syberg's Westport, Inc.*, 665 S.W.3d 348, 358–59 (Mo. App. E.D. 2023).

675 S.W.3d 514, 524–25 (Mo. App. E.D. 2023), *transfer denied* (Oct. 24, 2023) (quoting *Revis v. Bassman*, 604 S.W.3d 644, 655 (Mo. App. E.D. 2020)).

Here, Expert opined during his deposition that Dr. Li should have become aware of Decedent as a patient and seen Decedent within an hour of starting his shift at 7 PM. When asked about Dr. Li's testimony that he did not become aware of Decedent until after he coded shortly before 10 PM, Expert explained that Dr. Li should have made himself aware of Decedent's designation as a patient, which *could* have been done by viewing the hospital's electronic record system, Epic, and that, had Dr. Li been using the system as he claimed to have done that evening, Dr. Li would have been alerted to the fact that he was named as the admitting and attending physician for Decedent. Expert opined that it is the duty of an attending physician to be aware of the patients assigned to them.

> Q: What opinion do you have from the records as to when he was aware of Mr. Knight's admission to the hospital?
> A: Well, again, I wouldn't say it's an opinion. It's what did the facts showed. And the facts show that Dr. Li's name was attached to several consultations and several orders. In addition to being simply named as the attending of record, any reasonable clinician would have been alerted to their role in patient -- in this patients care much sooner. So upon arriving on call or on service that evening.
> Q: How?
> A: I'm not sure I understand your question.
> Q: How would any reasonable clinician be aware of patients on -- that are, I guess, assigned to them? How at this hospital? What do the facts show you?
> A: Well, the facts show me that they use Epic, which is the same electronic medical record system that we use at Massachusetts General Hospital. It was the same one I used at Dartmouth as well. And when you come on service, there are -- and you log into the computer, which Dr. Li clearly said he was doing, there are lists that are created that include you and your name as to every patient that you're attributed to. And so as these orders were being placed and his name was attached to them, because he's the attending of record, he would have had -- been alerted to his presence in this patient's care.
> Q: What orders are attached to Dr. Li's name? … The orders assigned to Dr. Li are general admission orders that were entered by a nurse under his name. Do you understand that to be the case, such as point of care glucose, inpatient respiratory OSA protocol that triggered a protocol? Do you utilize a protocol for OSA precautions that your -- in your Epic system.

A: I don't believe so.

Q: Are you aware of every order at the time that it goes in that it put under your name by a nurse for your patients?

A: I'm not but what I was alluding to previously was that these things are com – these things are being entered. And when you're in the system, you are aware of them…. And what happens is I'm alerted that I'm in charge of this patient. When I go into Epic to do other things, it's there on a list. The orders pop up.

Expert also explained that Dr. Li could have been informed of his role in Decedent's care through his designation as a co-signer on the "note" started by the nurse practitioner related to Decedent's initial admission care:

A: …The other thing I would mention is you could typically see in -- in Epic you can see who started a note on someone. And so the other thing that I'm a little puzzled by, you know, obviously -- and was testified and there's evidence to the fact that NP [S.S] had started her note. And if he's assigned as a cosigner, Dr. Li, that's another avenue that he would have seen his involvement in this case. So her note that she started -- I forget the specific time. I want to say the note was started at 6:24. And she said she saw the patient at 7:15, if I'm recalling correctly. When he's assigned as the cosigner, which she needed to do -- so he was assigned as the cosigner, when he opens up his Epic, that is available to him as well.

Q: What's the basis of you -- that's what --that's how it works at Mass General through your Epic system?

A: That's just how Epic works.

Q: How do you know that? How do you know that? Give me the basis for that opinion?

A: For the past 15 years, I've used that software.

Q: Used the software that's built out specifically for Mass General by the Epic Corporation?

A: Well, I would agree with you that there are specific nuances that you can -- that you can program for each institution, but I've used Epic across multiple, you know, institutions. And there's basic functionalities that are ubiquitous and that's one of them. When you put on a cosigner, you can kind of see that you're attributed to that patient. When you're the attending of record, that's just -- that's just present to you.

Q: Other than your personal experience, what knowledge do you have that SSM Epic system for this hospital allowed for those things?

A: Because that's what the standard of care is. And to say that Dr. Li, when he comes on, doesn't have access to knowing who he's in charge of and who he's assigned to as the attending of record would be a breach in the standard of care for -- for how a hospital should work. And so if a physician comes in, there's no way for me to know who I'm assigned to be in charge of, that would be extremely atypical

When asked about SSM St. Joseph's practice allowing for patients to be cared for by nurse practitioners initially upon admission, Expert stated that "any reasonable attending in this situation would have been aware that this patient was on their list" due to their designation as attending or admitting physician. When further asked about how Dr. Li was supposed to be aware of any concerns following Decedent's initial exam by the nurse practitioner when the nurse practitioner had yet to speak to him about Decedent, Expert stated that Dr. Li "should have been alerted to the presence of the patient and his role in the patient's care independent of NP [S.S.]," which could have been done by means of the "patient list" on Dr. Li's Epic.

While Expert did testify that Dr. Li could have used the Epic system to learn that Decedent was his patient, Expert's testimony did not suggest or imply that the Epic system, on its own, sets the standard of care relating to when a physician should be aware of the assignment of a patient and in what timeframe the physician must see a patient. Rather, as shown above, Expert's testimony opines that the standard of care requires attending physicians to review their current patients at the beginning of their shifts, and that the Epic system may aid a physician in obtaining the necessary knowledge in order to do so. Accordingly, SSM St. Joseph's use of the Epic system is merely ancillary to such duty, as attending physicians may use the system as a means to avail themselves of such information.

> In its order striking Expert's testimony on standard of care, the trial court found
>
> [Expert] apparently ignores the fact that Dr. Li was unaware of Knight's admission to the hospital. [Expert's] opinions seem more based on would have, could have, or should have based only on the use of the Epic system which he was familiar with in Massachusetts that the protocol of SSM and ignoring the facts of the present case. It is this Court's opinion that [Expert's] observations in this case rest upon his unsupported assumption that Dr. Li could have availed himself to knowing about Knight by simply opening the Epic system. But this assumption is contradicted by fact that Dr. Li's sworn testimony is that he did not know that Knight was a patient. Further, nurse practitioner [S.S] never informed or consulted with Dr. Li prior to

10

> Knight's code blue and subsequent death. Nurse practitioner [S.S.], who was deposed in this case, confirmed these facts.
>
> …
>
> With only depositions and arguments of counsel it is almost impossible to determine what technique or theories [Expert] would offer to support his conclusions. Likewise, and most importantly, [Expert's] position indicates that he relies solely on the use of the Epic system, and Epic only, to support his argument that Dr. Li was negligent or did not meet the standard of care in treating Knight. The Court questions whether the Epic system has been generally accepted in the scientific community to support his argument that Dr. Li was negligent or did not meet the standard of care.

On this record, we find that the trial court abused its discretion in striking Expert based entirely on the reasoning that Expert relied only on his knowledge and use of the Epic system to support his opinion as to standard of care, as we find the testimony related to Epic to be immaterial to the discussion of the applicable standard of care. Notably, the standard of care question is not whether Dr. Li actually knew about Decedent's designation as his patient or whether he could have easily accessed such information using Epic, as both are questions of fact. Rather, the standard of care question is whether Dr. Li had a duty to know about Decedent's designation as a patient and see him within an hour of starting his shift. As discussed above, Expert testified extensively to his opinion that the standard of care imposed a duty on an attending physician to be aware of which patients are his patients and to see his patients within a reasonable amount of time. Indeed, Dr. Li's testimony that he was unaware of Decedent is a potential *factual* question more fitting under a breach of duty analysis rather than standard of care analysis. *See Ragsdale v. Charlton*, 689 S.W.3d 269, 272 (Mo. App. E.D. 2024) ("Where reasonable minds could infer negligence, determinations of breach of duty are questions of fact for the finder of fact, not questions of law for this court."). Moreover, "[n]either the trial court nor this Court is authorized to determine the credibility of statements or testimony made under oath offered in support of or in response to a motion for summary judgment." *Id.* (quoting *Ross*

11

*v. Presley*, 359 S.W.3d 156, 160 (Mo. App. S.D. 2012)). Such a dispute of material fact between witnesses further bars this action from disposition at the summary judgment stage.

Therefore, because the trial court abused its discretion in striking Expert and subsequently granting summary judgment in favor of Dr. Li for Appellant's inability to provide expert testimony on standard of care, Points I and II are granted.

**Point III**

In her third and final point on appeal, Appellant argues the trial court erred in granting summary judgment in favor of Dr. Bishara and SLCC for lack of a physician/patient relationship between Respondents and Decedent. Specifically, Appellant argues that a physician-patient relationship existed because Dr. Bashara and SLCC were contractually obligated to perform a consult on Decedent and that they undertook actions to begin treatment, such as accepting Decedent as a patient and reviewing Decedent's records.

A physician's duty of care to a patient is generally derived from the physician-patient relationship. *Lowe v. Mercy Clinic E. Communities*, 592 S.W.3d 10, 19 (Mo. App. E.D. 2019) (citing *Millard v. Corrado*, 14 S.W.3d 42, 46-47 (Mo. App. E.D. 1999)). The law defines a physician-patient relationship as a consensual relationship where the patient or someone acting on the patient's behalf knowingly employs a *physician who consents to treat the patient*. *Id*. "Where a consulting physician does not physically examine or bill the patient, a physician-patient relationship can still arise where the physician is *contractually obligated to provide assistance in the patient's diagnosis or treatment and does so*." *Id*. at 19-20 (citing *Corbet v. McKinney*, 980 S.W.2d 166, 169 (Mo. App. E.D. 1998)) (emphasis added).

In *Corbet v. McKinney*, this Court held that

where the consulted physician merely undertakes to advise the patient's treating physician, has no explicit contractual obligation to the patient, treating physician,

12

or treating hospital to provide care, and does not take actions which indicate knowing consent to treat a patient who has sought that treatment, such as by examining, diagnosing, treating, prescribing treatment for, or charging the patient, no relationship and no duty of care arises.

*Corbet v. McKinney*, 980 S.W.2d at 170). This Court applied this holding in *Lowe v. Mercy Clinic East Communities*, finding that a physician-patient relationship existed for an on-call surgeon for the emergency department that was contractually obligated to participate in the patient's diagnosis and treatment and undertook to do so by providing treatment input to the attending physician. *Lowe*, 592 S.W.3d at 20.

Here, Dr. Bishara admits he had a contractual obligation to perform a consultation on Decedent due to his relationship as a consulting physician with SSM St. Joseph. However, Dr. Bishara argues that because the Emergency Department did not request an *urgent* consultation and because he was not contacted directly by the Emergency Department physician about Decedent's condition or diagnosis, he consequently had no involvement in Decedent's diagnosis or treatment, and thus no relationship was established.[3] Alternatively, Appellant argues that Bishara became involved in Decedent's treatment when NP T.T. accepted Decedent as a patient on behalf of Dr. Bishara.

Whether a physician-patient relationship existed here is entirely dependent on whether NP T.T.'s express acceptance of Decedent as a patient on behalf of Dr. Bishara or as an agent of SLCC, and her subsequent review of Decedent's medical records, satisfied the requirement set by *Corbet* and *Lowe* that physician-patient relationships may exist where the physician consents to treat the patient or where a physician is contractually obligated to provide assistance in the

---

[3] While the parties debate the applicability of SSM St. Joseph's rule 3.8.3 regarding requests for urgent consultation, we find any question of its applicability more relevant to questions of duty and breach, rather than the establishment of the physician-patient relationship

patient's diagnosis or treatment *and does so*, in that the relationship here was purportedly consented to by NP T.T. and the treatment process subsequently begun, although cut short by Decedent's death. Ultimately, this determination involves material questions of fact regarding whether a physician-patient relationship was established either by consent or by contract and treatment, which are solely reserved for the fact finder and are improper for summary judgment. *See Millard*, 14 S.W.3d at 52 (reversing grant of summary judgment where material questions of fact remained as to the existence of a physician-patient relationship). Point III is therefore granted.

## Conclusion

For the foregoing reasons, the judgment of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion.

Renée D. Hardin-Tammons, J.

Philip M. Hess, P.J., and
Gary M. Gaertner, Jr., J., concur.