**CITY OF SULLIVAN, Missouri,**
**Appellant,**

v.

**TRUCKSTOP RESTAURANTS,**
**INC., et al., Respondent.**

**No. ED 83236.**

Missouri Court of Appeals,
Eastern District,
Division Three.

Aug. 31, 2004.

---

1. All subsequent statutory references are to RSMo 2000, unless otherwise noted.

Jess W. Ullom, Doster, Mickes, James & Ullom, Chesterfield, MO, Matthew A. Schroeder, Union, MO, for appellant.

Paul H. Gardner, Jefferson City, MO, for respondent.

Before MARY R. RUSSELL, P.J., CLIFFORD H. AHRENS, J., and WILLIAM H. CRANDALL JR., J.

PER CURIAM.

The City of Sullivan ("City") appeals from the judgment of the Circuit Court of Franklin County, after jury verdicts which awarded damages to seven of the plaintiffs and a declaratory judgment by the trial court. The trial court found that as a matter of law, the City had violated an ordinance for the classification of customers for electricity rates, resulting in overcharges to a number of the plaintiffs in the case. The trial court awarded damages to those plaintiffs, and also ordered City to pay prejudgment interest on the damage award. Truckstop Restaurants, Inc., Peterson Oil Company, Midwest Petroleum, Inc., Casey's General Stores, Inc., Westbrooke Hotel Partners, Wallis Oil Company, Sullivan Bowl, and West Brothers Chrysler ("plaintiffs") cross-appeal from the judgment of the trial court. We affirm in part and reverse in part.

Viewed in the light most favorable to the judgment, the evidence shows the following. During the relevant period, January 1, 1987 to February 1, 1995, City operated its own municipal electrical power utility and provided electrical power to residents of City. Plaintiffs were among the residents to whom City provided electricity. City's municipal ordinances, adopted and incorporated into the City Code, governed the operation of City's electrical utility.

Section 69.020 of the 1985 City Code contained several related definitions: "residential dwelling," "commercial dwelling," and "industrial user."[1] Section 69.040 concerned the establishment of different customer classifications, and provided that "such electric current and service shall be furnished to all regular consumers through a meter according to the schedule of classifications hereinafter set forth to which each consumer may qualify, and according to the rates applicable thereto." There were three different rates in the City Code contained in Sections 69.050, 69.060, and 69.070.[2] Section 69.050 listed the rate for residential service, and stated that those

1. Section 69.020 was as follows:
   *Definitions—Residential Dwelling.* A residential dwelling is defined as a residential dwelling inside the city limits of Sullivan with one-family occupancy only. *Commercial dwelling*—a commercial user is any service other than residential with up to 100 KW demand and shall be considered commercial. *Industrial user*—an industrial user is hereby defined to mean any customer over 100 KW demand who shall be considered an industrial user in the City of Sullivan.

2. There was a separate rate for the heating of homes and water heating contained in Section 69.065, which applies if there is a separate meter for the use of electricity for those purposes only.

rates apply "to residences as hereinbefore defined for all domestic purposes, only[.]" It further provided that these rates were "not available to that portion of any residential dwelling used for business or professional purposes." Section 69.060 set the rates for "Commercial Service," and further stated that "[t]he character of service which shall be single or three-phased, 60 cycle, and at one standard delivery voltage required commercial and available at consumer[']s service location." That section did not reference any definition of "commercial." It did provide a rate per kilowatt hour for monthly use of 5,000 to 20,000 kilowatt hours, and a rate for monthly use exceeding 20,000 kilowatt hours. The third set of rates, contained in Section 69.070 was not specifically for industrial users, but rather was "General power, Manufacturers." Unlike Sections 69.050 and 69.060, this section set its own standard for when it applied, providing that "[t]he following rate shall apply to energy for power purposes when the customer has a connected load of 25 KW or more."

Section 69.160 provided a mechanism to resolve disputes over rates and rate classification. It stated that in the event of a conflict or uncertainty, the "rate or rate classification applicable to such consumer shall be determined by the Mayor and Board of Aldermen of said City of Sullivan." It did not provide who has the burden of claiming conflict or uncertainty over rates or classification, how such conflict or uncertainty had to be brought to City's attention, or how the Mayor and Board of Aldermen would make the determination.

Plaintiffs operated businesses during all or part of the period from January 1, 1987 to February 1, 1995, and were customers of City for electric power. City billed plaintiffs for electricity at the commercial rates. Prior to February 1, 1995, none of the plaintiffs were billed at the general power rates set forth in Section 69.070. Bradley Brown ("Brown"), a self-described "rate analysis engineer" with a degree in electrical engineering, separately contacted plaintiffs in 1992 and 1993, indicating that their bills for electricity might be too high, and offered his services in reviewing their bills.

Based on his review of plaintiffs' records and information provided by City, Brown determined that plaintiffs should have been billed on the general power rate rather than the commercial rate, and had been overcharged for electricity. On June 11, 1993, Brown sent a letter to John Butz, City Administrator ("Administrator"). Brown informed Administrator of the results of his review and requested that City immediately place plaintiffs on the general power rate and refund to them the alleged overcharges based on the difference between the commercial power rate and the general power rate, dating back to the adoption of the ordinance setting the rates, plus interest on that amount at nine percent per year.

Brown received a response from the city attorney, which denied that plaintiffs had been billed incorrectly for electrical service and stated that City would not issue any refunds. He stated that the mayor and aldermen of City were in charge of resolving uncertainties about classification. City attorney also requested that Brown cease to harass the staff of City and direct any further correspondence to him at his own private office. Brown made several more requests on behalf of plaintiffs to City, with no apparent effective result. Brown advised plaintiffs to pursue litigation and recommended an attorney. By February 1995, plaintiffs that were still in operation had received demand meters and had been

placed on the general power rate.[3] During 1995, City conducted a study of electrical rates, and on October 15, 1996, it enacted a new ordinance revising the provisions on electrical service and rates.

On August 25, 1995, plaintiffs filed suit against City in a three-count petition. Count I was an action for declaratory judgment seeking the construction of City's ordinances and "for such further relief as may be equitable"; Count II, subsequently dismissed, was an action seeking an injunction; and Count III was an action for damages for rate over-charges.

Plaintiffs presented documentary evidence which included their billing records, correspondence, City's ordinances, and the 1995 rate study done by Allgeier Martin and Associates ("Allgeier Martin"). Plaintiffs also presented testimony from representatives of their companies, employees of City, Brown, and an engineer from Allgeier Martin.

The testimony from the representatives was largely similar. The plaintiffs received bills for electricity from City and paid them during all or part of the relevant period, depending on the individual firm. Plaintiffs were not aware that they could have been on the lower cost general power rate, and never received information directly from City about the option of being billed at that rate. All of the plaintiffs were contacted by Brown, who indicated that they might be being overbilled for electricity, and agreed to retain his services. On cross-examination, the representatives of plaintiffs indicated that the buildings and businesses on the premises had all been constructed and in operation, in some form, prior to the enactment of the 1985 ordinance at issue, some as far back as the 1950s. Most of these repre-

sentatives also indicated that the businesses had changed somewhat over time.

Joseph Thurmond, Electrical Superintendent ("Superintendent") for City also testified. He has held that position from October 1980 to the time of trial, and prior to that he had worked for the electrical utility of City under the supervision of his father. Superintendent did not have a degree in electrical engineering, and did not have any special training regarding utility rate-making. He and his staff construct the power lines, install meters, trim trees, perform lineman work and read meters. Superintendent personally determines the rate classification for non-residential customers. He would examine the site of a new customer, talk to the building or electrical contractor, look at the type of equipment, and consider the type of business operations, and decide what the appropriate rate classification of the location should be, following the guidance of the ordinance. The rate classification was done at the start of service, and City did not re-evaluate the classification thereafter, unless requested to do so. Superintendent did not specifically know all of the changes that were made in plaintiffs' premises, and was not generally aware of any changes in character of operation or in the size of electric service to plaintiffs' properties.

Superintendent provided his definition of "connected load," a term not defined in the ordinance or City Code between 1985 and 1996, as "any part of the service within a building connected to the service entrance that has potential of becoming load[,]" and explained that it is not governed by usage. He agreed that the current ordinance used a different measure for classification based on measured demand, "demand" being the amount of energy actually used. Superintendent stated

**3.** Several of the plaintiffs had received de- mand meters during the course of 1994.

that connected load does not fluctuate with usage, in contrast to measured demand. He also stated that he believed that the ordinance at issue required a customer with a "connected load" of 25 KW or more to be placed on the general power rate and that was the sole criterion, and that a demand meter was not needed to determine "connected load." Superintendent agreed that it was not mathematically possible for a customer to have a kilowatt reading of 18,250 and have a connected load of less than 25 KW.

Lecia Maupin ("clerk"), billing clerk for City, testified that she had worked for City performing the billing for utility service since 1991. She explained how billing and calculating rates worked before and after the 1995 rate study. She took the information provided by the meter readers and input the data into the computer, which calculated the customer's bill. She identified a number of customers whose facilities were built during the period from the late 1950s to 1976 which were billed at the general power rate. Between 1991 and 1995, clerk did not monitor the kilowatt usage of customers, though that information was on the bills sent to each customer, but since 1996, with new computer equipment and software, usage has been monitored.

Clerk stated that particular companies that were on the general power rate between 1987 and 1995 that had been compared to plaintiffs had either been built in the late 1980s or early 1990s, and/or had large facilities with lots of electrical equipment. She also testified as to how the power usage for several of the plaintiffs had fluctuated or changed between January 1987 and 1995. She stated that Sullivan Bowling Alley, for example, had used 7,440 kilowatt hours in April 1987 as compared to 17,920 kilowatt hours in April 1995, and 7,000 kilowatt hours in September 1987 versus 20,000 kilowatt hours in September 1995. Clerk also testified that certain of the plaintiffs' facilities had changed over time in terms of the services offered and electrical equipment used. On cross-examination by plaintiffs, clerk could not explain why certain businesses had been on the general power rate that did not appear, at least during certain times between 1987 and 1995, to match the criteria in the City Code for classification as an industrial user, or have an actual demand that reflected a connected load of 25 KW or more.

Brown, who has a degree in electrical engineering, testified for plaintiffs. Brown declared that he was a "rate analysis engineer" and had completed a two-day course in 1991 on rate analysis for a variety of utilities. Brown performed rate analysis for electric, natural gas, sewer, and water services for facilities. He explained how he generally performed a rate analysis for a facility. He would analyze the relevant rates and rules and regulations pertaining to those rates with regard to the particular facility and its characteristics. If the utility were run by a municipality, he would examine the ordinances and verify if the customer was being charged properly in accordance with the ordinances. He ordinarily relies on a customer's bills and an examination of its physical facility in forming an opinion about whether a customer of an electrical utility is correctly classified for billing. Regarding his own services, he uses a contingency contract with clients, so that his services cost them nothing if they do not get a refund or a reduced rate for the future. His standard agreement assumes no litigation. If litigation resulted, he offered his services as an expert witness.

Brown explained the meaning of several terms, including "load factor" and "connected load." He stated that the load

factor "relates to how much maximum load they're pulling per month compared to their usage." He elaborated by saying that mathematically, load factor is the number of kilowatt hours used each month divided by the kilowatts used that month. Load factor is roughly the same from month to month. He contrasted a high load factor versus a low load factor by noting that a facility open twenty-four hours a day, 365 days a year would have a high load factor, whereas a place open only from Monday to Friday from 8:00 a.m. to 5:00 p.m. would have a low load factor. The former, he stated, is drawing power all the time, while the latter is drawing power for a short time. Connected load, Brown explained, is the load that would be drawn if all electrical devices at a facility were in operation at the same time for fifteen minutes. He testified that a demand meter is not necessary to determine the connected load, though it is one method for measuring it. He stated that one could figure out the connected load by examining a contractor's drawings and add up all the various loads that the facility planned to put in. Brown averred that it was also possible to determine if a place had a connected load of 25 KW or more even with a kilowatt hour meter instead of a demand meter, in that a facility with such a connected load operating constantly for an average month would have a reading of 18,250 kilowatt hours. Accordingly, any place using 18,250 kilowatt hours or more per month had to have a connected load of at least 25 KW. Brown further explained that readings below 18,250 kilowatt hours in a month did not automatically mean that a customer had a connected load of less that 25 KW, as many places would not use all of their equipment twenty-four hours a day, every day, in a month.

He stated that in order for a facility that had reached the level of 18,250 kilowatt hours in a month to drop below a connected load of 25 KW thereafter, it would be necessary to remove or disconnect some of the equipment that could draw a load.

Brown explained why he had multiple different calculations for the load factors for each of the plaintiffs.[4] Rather than reflecting the unreliability of calculating the load factor for an individual property, he stated that what he had done was to refine his initial calculations of load factor for each of the plaintiffs based on the receipt of more information. He said that after City had placed demand meters at the businesses of plaintiffs still operating, he was able to use the information from the demand meter readings first for an eighteen month period and then for a thirty-six month period to better calculate what the load factors should have been for the companies.

Vernon Lawson ("Lawson"), an engineer for Allgeier Martin was called as a witness by both plaintiffs and City. Plaintiffs examined Lawson concerning the 1995 rate study done by Allgeier Martin for City and the recommendations made by that study. He testified that the rate study recommended that customers using 10,000 kilowatt hours or more per month be placed on the general power rate instead of the commercial rate because of the load that such users would have. Plaintiffs had Lawson examine an exhibit showing the power usages of a number of plaintiffs during the 1987 to 1995 period for which the particular businesses had monthly power use of 10,000 kilowatts or more. He stated that based on those figures the

4. Brown used the load factor for each of the Plaintiffs in calculating the alleged overcharges to them by City, hence different load factors for a particular plaintiff meant different alleged overcharges and therefore different damages.

customers should be on the general power rate.

Lawson explained a number of terms relating to electrical power, including "kilowatt," "connected load," "measured demand," and "load factor." He stated that load factor "is simply the amount of time during a given billing period, such as a month, that you use this given load … And it's what—the percentage is the percent of the time period that you are measuring this particular load." He further explained that load factor is not the same as demand. Lawson testified that City had to purchase new equipment and software to monitor customers' usage in order to properly comply with the October 15, 1996 ordinance. He also stated that Brown's use of load factors to calculate damages to plaintiffs was not appropriate because it did not reflect an actual demand, but rather an estimated demand. Lawson averred that actual demand could not be determined without a demand meter.

The jury returned verdicts in favor of seven of the plaintiffs and awarded damages totaling $22,380.55, and verdicts against three of the plaintiffs. The trial court initially entered judgment on those verdicts on Count III on September 30, 2002. The trial court subsequently granted plaintiffs' motion for prejudgment interest on those damages. On April 9, 2003, the trial court entered judgment on Count I of the second amended petition, which judgment incorporated the essence of the September 30, 2002 judgment. The trial court found as a matter of law that City's ordinance, as codified in section 69.070, required City to place all customers with a connected load of 25 KW or more on the general power rate. The trial court further found that a monthly kilowatt reading of 18,250 established as a matter of law that a customer had a connected load of 25

KW or more, and that there was no evidence that any of the plaintiffs during the relevant period ever altered their facilities so as to reduce the connected load. It further held that City improperly applied the commercial service rate to plaintiffs' properties and that many customers of City with similar facilities were placed on the general power rate. The trial court noted which of the plaintiffs had monthly kilowatt readings of 18,250 or more and when, and added that "it is still clear from the evidence" that those plaintiffs that did not have such a level of monthly usage still had a connected load of 25 KW or more "from the very beginning." The trial court stated that based on the evidence, "it should have granted plaintiffs' Motions for Summary Judgment and for Directed Verdict, at least to liability."

The trial court also held that City's duty to place customers on the proper rate structure was "triggered by the actual connected load[,]" and that consequently damages start with the first month with a power reading of 18,250 kilowatt hours. The trial court further found that there was no serious dispute as to the method of computing rate overcharges and "it appears that the jury accepted the computation in reaching its verdicts." The court reaffirmed its previous rationale for granting prejudgment interest regarding the jury verdicts as to Count III, and held that prejudgment interest should apply to damages awarded by it under Count I, starting after June 11, 1993. The trial court awarded damages under Count I to nine of the plaintiffs in an amount totaling $101,659.86, exclusive of prejudgment interest.

City now appeals from this judgment, and plaintiffs cross-appeal.

City asserts in its first point on appeal that the trial court erred by failing to dismiss plaintiffs' second amended petition

for failure to state a claim upon which relief can be granted, or alternatively, erred by denying its motion for a directed verdict because there can be no claim for damages against a municipal utility for rate overcharges unless a plaintiff can show that the charges were "clearly, palpably and grossly unreasonable" and plaintiffs failed to plead and failed to prove this requirement.

The defense of failure to state a claim upon which relief may be granted can be raised at any time, including upon appeal. Rule 55.27(g); *Norber v. Marcotte*, 134 S.W.3d 651, 657 (Mo.App.2004). The failure to state a claim upon which relief may be granted is a jurisdictional defect. *Norber*, 134 S.W.3d at 657. Jurisdiction is a question of law that this Court reviews *de novo*. *Blackburn v. Mackey*, 131 S.W.3d 392, 395 (Mo.App.2004). The review of whether a petition fails to state a claim requires this Court to consider the pleadings, allowing them their broadest intendment, and accepting as true the facts as pleaded with all reasonable inferences arising therefrom. *Norber*, 134 S.W.3d at 657. If the allegations raise principles of substantive law that would entitle a plaintiff to relief, the petition should not be dismissed. *Id.*

The standard of review for the denial of a motion for a directed verdict is different. The main question in reviewing a trial court's denial of directed verdict or JNOV is whether or not the plaintiff made a submissible case. *Missouri Department of Transportation ex rel. PR Developers, Inc. v. Safeco Insurance Company of America*, 97 S.W.3d 21, 31 (Mo.App.2002). Substantial evidence is required for each and every fact essential to liability in order to make a submissible case. *Id.* The issues of whether the evidence is substantial and whether the inferences drawn are reasonable present questions of law. *Id.* We view the evidence in the light most favorable to the verdict, giving the plaintiff the benefit of all reasonable inferences. *Id.*

City asserts that municipal utilities "are subject to the will and regulation of its own citizens[,]" citing *Lightfoot v. City of Springfield*, 361 Mo. 659, 236 S.W.2d 348, 352–53 (1951). City quotes language to the effect that for municipally owned utilities, "the legislative function of fixing rates is in the municipality to be in no way affected by any regulation except the will of its own citizens." *Id.* City goes on to observe that Missouri courts examining rates charged by a municipal utility to its customers look to see if the particular rate is "clearly, palpably and grossly unreasonable[,]" quoting *Shepherd v. City of Wentzville*, 645 S.W.2d 130, 133 (Mo.App.1982). City further quotes *Shepherd* to state the principle that setting rates and determining whether there should be differences in rates between classes of customers and how much of a rate difference are legislative, not judicial functions, and accordingly there is a strong presumption that such rates are reasonable. *Id.*

City is correct that setting rates and differentiating between classes is a legislative function, and that the courts, when looking at a particular rate charged by a municipally owned utility, look to see if the rate is "clearly, palpably and grossly unreasonable[.]" *Id.* City cites a number of cases for the proposition that Missouri courts have judicially placed only limited obligations on municipally owned utilities, to-wit to provide reasonably good service, to treat all classes of people alike, to impose only regulations and rules that are just and reasonable, and to not set rates that are clearly and grossly unreasonable. *See Shepherd*, 645 S.W.2d at 133; *Forest City v. City of Oregon*, 569 S.W.2d 330, 333 (Mo.App.1978); *State ex rel. Shewalter v. Jones*, 141 Mo.App. 299, 125 S.W. 1169,

1170 (1910). *See also Lightfoot*, 361 Mo. 659, 236 S.W.2d 348. However, these cases are distinguishable from the case before this Court, which involves a claim that plaintiffs were put in an incorrect classification and suffered discrimination on rates. In *Forest City*, 569 S.W.2d 330, *Lightfoot*, 361 Mo. 659, 236 S.W.2d 348, and *Shewalter*, 141 Mo.App. 299, 125 S.W. 1169, the plaintiffs were challenging a rate or charge, effectively asserting that the rates were excessive, unreasonable, and/or discriminatory. None of the plaintiffs in those cases were asserting that they had been misclassified and placed in an incorrect class, the rates for which were proper and reasonable for the correct members of the class.

City also relies on *Shepherd v. City of Wentzville*, 645 S.W.2d 130 (Mo.App.1982). This case is also distinguishable. In *Shepherd*, the plaintiff directly attacked the ordinances setting the water and sewer rate classifications. He did not contend that his buildings were misclassified and placed in the improper class, but rather that the ordinances were unreasonable, arbitrary, and unconstitutional because they placed multi-unit complexes, which included apartment buildings and multi-business office buildings, in a different class from motels and hotels and charged in a different manner. *Id.* at 132–33. The appellate court in *Shepherd* held that the trial court properly held that Shepherd did not prove that the classification of multi-complex dwellings was "clearly, palpabl[y] and grossly unreasonable." *Id.* at 133 (quoting *Forest City*, 569 S.W.2d at 333).

■ Plaintiffs in the case before this Court did not attack the ordinances or the rates or the different classes of consumers for billing rates. · Rather, the second amended petition alleges ·that under the applicable ordinance of City, the plaintiffs individually should have been billed at the general power rate and method· because they had connected loads of 25 KW or more, and that City did not properly classify and bill them, and refused to do so until February 1995, with the result that they were damaged by being overcharged, and also alleged that the rate classification and calculation methodology were unlawful and unreasonable. In essence, plaintiffs claim that they were damaged by City's failure to comply with the requirements of their own ordinances, and did not request that the court judicially determine what the appropriate rates were, a legislative function. Under our standard of review we believe that plaintiffs have sufficiently pleaded facts to support a cause of action at least as to Count III seeking damages for the alleged overcharges, and were not required to plead that the rates were "clearly, palpably and grossly unreasonable."

■ The trial court also did not err in denying City's motion for a directed verdict. Based on the record before this Court, plaintiffs made a submissible case. They were not required to plead and prove that the rates were "clearly, palpably and grossly unreasonable" as they were not challenging the lawfulness òf the rates or of the classification scheme. Plaintiffs' claims are based on a construction of City's ordinance regarding electrical service.

Missouri statutes do not place an affirmative duty on municipally owned utilities to monitor the bills or service usage by customers, and they do not place a duty on such a utility to actively determine the best rate or billing plan for each customer every billing cycle. Not does the language of the 1085 ordinance impose such an affirmative duty on City. Section 69.160 states that whenever any conflict or uncertainty is found to exist or arises regarding the rate or rate classification applicable to any

consumer, the rate or rate classification "shall be determined by the Mayor and Board of Alderman" of City. But that section does not set forth any particular administrative mechanism for consumers to request clarification of the "conflict or uncertainty." Section 69.160 placed a duty upon City to resolve the conflict regarding proper classification of the consumer when such was found to exist or arose once it was brought to the attention of City. Neither that section nor any other part of the ordinance clearly defines a duty on the part of City to monitor its customers' bills and power usage, or to reclassify its customers *sua sponte.* There is also no clear duty on consumers to complain that they were improperly classified. Consequently, we cannot say as a matter of law that plaintiffs failed to make a submissible case as to Count III of the second amended petition.

City makes a number of contentions in the argument portion of its brief for its first point which were not included in its first point relied on. We need not consider errors raised for the first time in the argument portion of the brief that are not raised in the point relied on. Rule 84.04(e); *Pearman v. Department of Social Services,* 48 S.W.3d 54, 55 (Mo.App. 2001). Point denied.

In its second point on appeal, City contends that the trial court erred in awarding a monetary judgment to plaintiffs pursuant to Count I of the second amended petition for equitable relief because plaintiffs had an adequate remedy at law pursuant to Count III, and because Count I was otherwise abandoned or rendered moot by the voluntary dismissal of Count II and City's reclassification of plaintiffs to the general power rate in January 1995.

In order to maintain a declaratory judgment action, a party must meet four requirements. *Grewell v. State Farm Mutual Auto. Insurance Co., Inc.,* 102 S.W.3d 33, 36 (Mo. banc 2003). First, the party must show that a justiciable controversy exists that presents a real, substantial, presently existing controversy as to which specific relief is sought. *Id.* The party must also demonstrate a legally protected interest directly at issue and subject to immediate or prospective consequential relief. *Id.* Third, the question presented by the party has to be ripe for judicial determination. *Id.* Fourth, the party must also show that he or she does not have an adequate remedy at law. *Id.*

A petition seeking declaratory relief may also seek additional relief, including damages, if properly stated in separate counts. *City of Creve Coeur v. Creve Coeur Fire Protection District,* 355 S.W.2d 857, 859 (Mo.1962); *Polk County Bank v. Spitz,* 690 S.W.2d 192, 194 (Mo.App.1985). There can be circumstances where it is desirable that the relationship of the parties be established because there may be a continuing relationship or future acts which depend on the outcome. *Spitz,* 690 S.W.2d at 194 (*citing* 22 Am.Jur.2d, Declaratory Judgments, Section 14, p. 855). However, "[a] declaratory judgment action is not used where an adequate remedy already exists at law." *Graham v. Goodman,* 850 S.W.2d 351, 356 (Mo. banc 1993).

In addition to seeking declaratory relief, plaintiffs also sought a remedy at law for damages. Count III of plaintiffs' second amended petition asserted that they had been overcharged for electric service as "a direct and proximate result of the unlawful, unreasonable, discriminatory classification and calculation methodology" applied by City. Plaintiffs further contended that City had refused to refund any of the alleged overcharges "resulting from the difference" between the commercial power rate and the general power rate under

which they should have been billed. Plaintiffs sought judgment against City "for the amounts that [City] has overcharged each facility . . ., for interest on the amounts of such overcharges and for such other and further relief as the Court deems just and proper." The verdict directing instructions for Count III permitted the jury to award damages from January 1, 1987 onwards. In closing argument the counsel for plaintiffs argued that "they almost all operated between January 1987 and December of 1994[,]" and that they were seeking "basically a total of $161,792.36" for all of the individual claims, and asked that the jury "compensate the plaintiffs for those periods when they were overcharged between January of 1987 and February of 1995[.]"

■ Plaintiffs had an adequate remedy at law for any monetary damages resulting from the overcharges for electric service by City. Count III specifically requested such damages, interest, and any further relief that the trial court might deem proper. The jury gave verdicts in favor of seven of the plaintiffs and three in favor of City, but awarded far less damages than the plaintiffs were seeking, to which the trial court added prejudgment interest. Merely because a jury awarded less damages than a plaintiff sought does not indicate that there was no adequate remedy at law. The ordinance at issue in this case was replaced by a new ordinance in October 1996, well over a year prior to the filing of plaintiffs' second amended petition, so Ordinance 1500 could not apply prospectively at the time of the filing, and certainly not by the time of trial in 2002. In addition, those plaintiffs still in business were all placed on demand meters before February 1995, and were all reclassified and placed on the general power rate by February 1, 1995. Again, these events happened well before the filing of the sec-

ond amended petition and well before the actual trial date, so there would be no prospective relief to be granted for the individual plaintiffs. While the individual plaintiffs still in business presumably have a continuing relationship with City as a provider of electric service, this relationship is governed by the October 1996 ordinance, or any applicable ordinances adopted since, not Ordinance 1500, and future acts do not depend on the outcome of a repealed or superseded ordinance. See Spitz, 690 S.W.2d at 194.

Further, the trial court could have instructed the jury as a matter of law concerning the construction of the ordinance, could have directed or partially directed a verdict, an action that plaintiffs requested in a motion, or granted a JNOV, which action plaintiffs also requested in a motion, or granted a new trial. The trial court did none of these. Instead, the court let the jury verdict stand. The jury effectively made fact determinations on the disputed issues of classification and damages.

■ In addition, the trial court's determination as a matter of law that City had notice and a duty to reclassify customers as soon as their monthly energy usage reached or exceeded 18,250 kilowatt hours is not supported by the record. As noted in our analysis of City's first point on appeal, Missouri statutes do not place an affirmative duty on municipally owned utilities to monitor the bills or service usage by customers. City's ordinance does not clearly place a duty on the part of City to monitor its customers' bills and power use or to reclassify its customers sua sponte, nor does it clearly place a duty on consumers to complain about improper classification. While this ambiguity is sufficient for plaintiffs to have made a submissible case, it would not support granting a motion for summary judgment in favor of plaintiffs, who had the burden of proof. The jury

could have reasonably construed the ordinance at issue to require the Mayor and Board of Aldermen to resolve a conflict or uncertainty in a customer's rate classification when the City had actual notice, not constructive notice, of such an issue, such as the notice provided by Brown's letter of June 11, 1993. While Brown and Lawson both agreed that a monthly power usage of 18,250 kilowatt hours or more indicates that a customer has to have a connected load of 25 KW or more, this fact did not create actual notice to City merely when a customer reached such a level of power use, and thereby trigger City's duty to resolve the uncertainty or conflict in rate classification under section 69.160.[5] The trial court cites to *City of Commerce v. Duncan & Godfrey Inc.*, 157 Ga.App. 337, 277 S.E.2d 266 (1981) as establishing a principle applicable to the case before this Court. *City of Commerce* is distinguishable in that the municipal utility in that case had a policy of permitting commercial users to be billed on peak demand by use of a special meter, evidently favoring certain types of users, but this policy was not apparently published or part of a public record. From receipt of its first bill, the plaintiff repeatedly complained to the municipality that the bills were excessive, but the municipal utility merely checked the regular meter, found it to be working, and failed to inform the plaintiff about the alternate method of billing which required a different meter. City's ordinances and different rates, in contrast, were public records, and plaintiffs did not complain about their bills starting in 1987, but rather in June 1993, and were aware of the different rates and the need for a demand meter.

Plaintiffs did not meet the four requirements necessary to maintain a declaratory judgment action. There was an adequate remedy at law. There was no need for immediate or prospective consequential relief. The issues for which plaintiffs sought declaratory judgment were no longer ripe; rather they were moot. The judgment for incidental monetary damages under Count I for declaratory judgment must be reversed. Point sustained.

In its third point on appeal, City argues that the trial court erred in granting plaintiffs' motion for prejudgment interest because the damages were neither liquidated nor readily ascertainable without expert opinion, and none of the public policy exceptions is applicable.

■■■■ Prejudgment interest under Section 408.020 RSMo 2000 is appropriate when the amount that is due is liquidated or readily determinable by computation or by reference to a recognized standard. *Midwest Asbestos Abatement Corp. v. Brooks*, 90 S.W.3d 480, 486 (Mo.App.2002); *Baris v. Layton*, 43 S.W.3d 390, 397 (Mo. App.2001). Exact calculation of a claim is not required for a claim to be considered liquidated. *Hocker Oil v. Barker–Phillips–Jackson*, 997 S.W.2d 510, 521 (Mo. App.1999). An award of less damages than requested does not prohibit an award of prejudgment interest on the damages awarded. *A.G. Edwards & Sons, Inc. v. Drew*, 978 S.W.2d 386, 396 (Mo.App.1998). The trial court may be guided by equitable principles of justice and fairness when determining whether to award prejudgment interest. *Id.*

City asserts that the plaintiffs' damages are not liquidated or readily ascertainable by computation or a recognized standard.

---

**5.** Based on the record before this Court, the trial court does not appear to have removed this issue from the jury's consideration. The record does not include any of the instructions that the trial court actually gave to the jury, other than the verdict directing instruction at issue in plaintiffs' second point on cross-appeal.

City points out that plaintiffs' expert, Brown, made four different calculations of damages for some of the plaintiffs, and that he admitted that whatever he determined to be the "load factor" for a business affected the calculation of the rate overcharges. City cites to *Nucor Corp. v. Nebraska Public Power District*, 891 F.2d 1343, 1352 (8th Cir.1989) for the proposition that damages in an electric service rate overcharge case are unliquidated and not readily ascertainable. *Nucor* did not involve a claim by a customer that it was overcharged because it had been misclassified, as is the situation in the case before this Court, but rather the assertion that the rates that Nucor was charged were not fair, reasonable and nondiscriminatory, i.e. that the rates themselves were improper for the class to which Nucor belonged. At issue in that case is the calculation of what the proper rate should have been for that class of consumer. The 8th Circuit in *Nucor* was interpreting Nebraska law, not Missouri law.

■ In Missouri, a claim for damages does not have to be calculated exactly for the damages to be considered liquidated. *Hocker Oil*, 997 S.W.2d at 521. In the case before this Court, Brown made up to four calculations in determining damages for various plaintiffs, which City contends shows that damages are not readily ascertainable. The situation in this case is unlike that in *Bill's Coal Company, Inc. v. Board of Public Utilities of Springfield, Missouri*, 887 F.2d 242 (10th Cir.1989). In that case, the appellate court applied Missouri law and found that the district court properly denied a claim for prejudgment interest. *Id.* at 246. The 10th Circuit determined that the claim was not readily ascertainable, the sellers having provided the trial court with several different calculations of damages, all of which were contested by the opposing party, which also offered its own alternative measures of damages. *Id.* Here, Brown made several different calculations before reaching the final set of damage computation, but explained that he did so based on further information which enabled him to refine his original calculations of load factors, in good part from the demand meters installed by City. Brown also testified that his methodology was accepted by the Public Service Commission and by AmerenUE. City in its brief asserts that this is hearsay, but failed to object to that testimony at the time, and offered no alternative measure of calculating damages, though it did dispute the accuracy of Brown's determination of load factors.

While none of the plaintiffs got all of the damages that they sought under Count III, several of them in fact receiving completely adverse verdicts, as noted above, an award of less damages than requested does not prohibit an award of prejudgment interest on the damages awarded. *Drew*, 978 S.W.2d at 396. Further, the trial court may be guided by equitable principles of justice and fairness when determining whether to award prejudgment interest. *Id.* We note that had City promptly provided demand meters to plaintiffs after receiving Brown's letter of June 11, 1993, damages would have been easy to ascertain from that date onward. It would be neither fair nor equitable to reward City for its delay in providing a way to accurately measure actual demand, and hence, actual damages. Viewing the evidence in the light most favorable to the verdict, and granting all reasonable inferences therefrom, the damages were sufficiently reasonably ascertainable, for the trial court to grant the request for prejudgment interest on the damages awarded pursuant to Count III. Point denied.

Plaintiffs raise two points in their cross-appeal. In their first point, plaintiffs contend that the trial court erred in limiting

their damages to the monthly billing periods starting with the monthly reading of 18,250 kilowatt hours or more for each plaintiff because the weight of the evidence showed that City had reasonable notice that it should have classified them on the general power rate when their monthly electric usage readings were 10,000 kilowatt hours or more, and failed to comply with its duty to provide electric service at the correct rate. Having held above that the plaintiffs had an adequate remedy at law and that the declaratory judgment action could not be maintained, plaintiffs' cross-appeal of the trial court's holding on damages in Count I is effectively moot. Point denied.

In their second point on cross-appeal, plaintiffs assert that the trial court erred in refusing to submit their proffered verdict directing instruction to the jury on their rate discrimination claim because submission of that instruction was supported by evidence that City charged customers similarly situated to plaintiffs at the general power rate while charging plaintiffs at the commercial rate.[6]

The issue of whether a jury has been properly instructed is a question of law. *Rice v. Bol*, 116 S.W.3d 599, 606 (Mo.App.2003). The trial court shall give or refuse an instruction according to the law and evidence in the case. Rule 70.02(a); *First State Bank of St. Charles v. Frankel*, 86 S.W.3d 161, 173 (Mo.App. 2002). Under Rule 70.02(b), a non-MAI instruction must be brief, simple, impartial, free from argument, and not submit to the jury or require findings of detailed evidentiary facts. *Frankel*, 86 S.W.3d at

173. When using a non-MAI instruction, the instruction must follow the substantive law and be understandable. *Altenhofen v. Fabricor, Inc.*, 81 S.W.3d 578, 589 (Mo. App.2002).

This Court reviews a trial court's refusal to submit an instruction for abuse of discretion. *Frankel*, 86 S.W.3d at 173 An instruction has to be supported by substantial evidence, which is evidence which, if true, is probative of the issues and from which the jury can decide the case. *Id.* In reviewing a claim that the trial court improperly refused a proffered instruction, this Court views the evidence and reasonable inferences therefrom in the light most favorable to the submission of the instruction and disregard contrary evidence. *Id.* In determining whether or not the jury was misled, misdirected, or confused by an instruction, the test is whether or not an average juror would properly understand the applicable rule of law being conveyed by the instruction. *Rice*, 116 S.W.3d at 606. This Court will not reverse a verdict due to instructional error, including the refusal to give an instruction, unless the error is prejudicial, materially affecting the merits of the action. *Frankel*, 86 S.W.3d at 173.

The trial court's verdict directing instructions regarding Count III appear to have been drawn from a proposed instruction submitted by plaintiffs that in turn relies on principles set forth in *B.G. De-Maranville, et al. v. Fee Fee Trunk Sewer, Inc.*, 573 S.W.2d 674, 676 (Mo.App.1978), a case in which it was alleged that Fee Fee Trunk Sewer, Inc. charged "discriminato-

---

6. Plaintiffs' proffered Instruction L is as follows:

Your verdict must be for Plaintiffs in you believe:

First, Plaintiffs were customers who received electricity from [City], and

Second, Plaintiffs paid for electricity from [City] based on rates calculated under [City's]

commercial service rate classification ordinance, and

Third, [City] charged higher rates to Plaintiffs than to other similarly situated customers in the same class, and

Fourth, Plaintiffs were thereby damaged.

ry, unjust and unreasonable rate charges" in violation of statutory provisions.[7] The non-MAI instruction on rate discrimination offered by plaintiffs arguably is supported by substantive law insofar as there is a general principle against discriminatory treatment, but the trial court found it far from understandable for the jury. *See Altenhofen*, 81 S.W.3d at 589. The offered instruction also would have required that the jury make findings of detailed evidentiary facts to reach the conclusion as to whether or not each of the plaintiffs were "similarly situated" to other businesses which had been billed at the general power rate. *See* Rule 70.02(b); *Frankel*, 86 S.W.3d at 173. Further, the evidence adduced at trial was not sufficient to show that plaintiffs were "similarly situated" to other customers that had been billed at the General power rate such that it would have justified the proffered instruction, absent any other issues. The trial court did not abuse its discretion in refusing to give plaintiffs' proposed instruction regarding rate discrimination. Point denied.

The judgment of the trial court is affirmed as to the jury verdicts on Count III of the Second Amended Petition and as to the award of prejudgment interest on damages pursuant to Count III, and is reversed as to its decision under Count I.

---

**7.** There were ten separate verdict directing instructions, one for each of the plaintiffs. The general form of those instructions is as follows:

Your verdict must be for [individual plaintiff] if you believe:

First, [individual plaintiff] was a customer who received electricity from [Sullivan] during the period from January 1, 1987 to December 31, 1994; and

Second, [individual plaintiff] paid for electricity from [Sullivan] based on rates calculat-

ed under [Sullivan's] commercial rate classification ordinance; and

Third, the general power rate classification was the proper rate classification applicable to electric service provided to [individual plaintiff]; and

Fourth, more than the rate authorized by the proper rate was collected from the [individual plaintiff]; and

Fifth, [individual plaintiff] was damaged.