Amelia BROWN, Ashley Plummer, Zina Plummer, Oneta Richardson, and Vena St. John, Respondents,

v.

Greg BAILEY, M.D., Appellant,

and

Tenet Health System d/b/a Forest Park Hospital, Olexandr Krinochkin, Michael Mandis, Pam Woods, Lee Hanson, Charles Wetherington, Defendants.

No. ED 86387.

Missouri Court of Appeals, Eastern District, Division Two.

Nov. 14, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 14, 2006.

Application for Transfer Denied Jan. 30, 2007.

Ann Marie Piana, Shanna K. Fulton, Eckenrode–Maupin, St. Louis, MO, for appellants.

Burton M. Greenberg, Leo Newman, Michael A. Gross, Joseph F. Yeckel, Law Office of Michael A. Gross, St. Louis MO, for respondents.

GARY M. GAERTNER, SR., Presiding Judge.

Appellant, Greg Bailey, M.D. ("Dr. Bailey"), appeals from the judgment of the Circuit Court of the City of St. Louis, following a jury trial, entered in favor of Respondents, Amelia Brown, Ashley Plummer, Zina Plummer, Oneta Richardson, and Vena St. John (collectively "Plaintiffs"). Plaintiffs filed a wrongful death action against Dr. Bailey, and Defendants, Tenet Health System d/b/a Forest Park Hospital ("Forest Park"), Olexandr Krinochkin ("Dr. Krinochkin"), Michael Mandis ("Dr. Mandis"), Pam Woods ("Nurse Woods"),[1] Lee Hanson ("Dr. Hanson"), and

---

1. Although no document in the record on appeal indicates that Nurse Woods was a party to this action or subsequently dismissed from this suit, Dr. Bailey states in his brief that Nurse Woods was dismissed from this suit. Because Plaintiffs do not contend otherwise, for purposes of this appeal only, Nurse Woods is listed as a "Defendant."

Charles Wetherington ("Dr. Wetherington") (collectively "Defendants"), seeking compensation for damages sustained as a result of the death of their mother, Loyce Plummer ("Decedent"). The jury found Plaintiffs' total damages to be $400,800, and assessed fifty percent of the fault to Dr. Bailey. We affirm.

On July 5, 2002, Decedent, at the age of 69, arrived at the emergency room at Forest Park via ambulance. She had a fever of 101 degrees, shortness of breath, chest pain, and complained of weakness, dizziness, headaches, and nausea. At that time, Decedent was taking the medication Coumadin, a blood thinner.

Dr. Hanson admitted Decedent to Forest Park shortly after midnight on July 6, 2002. When Dr. Hanson examined Decedent at 3:00 p.m. on July 6, 2002, she had pneumonia, complained of headaches, and her fever had increased to 103.4 degrees.

In the early morning hours of July 7, 2002, Decedent attempted to use the bathroom. As she tried to get out of bed, she became tangled in her IV tubing and fell and struck her head. At approximately 1:45 a.m., Nurse Woods paged Dr. Krinochkin, an intern, to inform him about Decedent's fall. Dr. Krinochkin responded to the page. He found Decedent sitting on the edge of the bed with a two to three centimeter laceration on her eyebrow. Decedent appeared confused and complained of a headache. Dr. Krinochkin sutured the laceration and returned every fifteen to thirty minutes to observe Decedent.

At about 2:50 a.m., Dr. Krinochkin became concerned about Decedent's mental status. After conferring with the resident on duty, Dr. Mandis, Dr. Krinochkin ordered a CT scan of Decedent's head. Dr. Krinochkin received the CT scan results about 4:45 a.m., which revealed that Decedent was suffering from an epidural hema-

toma and a subarachnoid bleed. When Dr. Krinochkin reviewed the results, he realized that Decedent required the urgent attention of a neurosurgeon because hematomas tend to increase in size and compress the brain. Dr. Krinochkin discussed the results with Dr. Mandis, who agreed that Decedent needed to be seen by a neurosurgeon right away.

Thereafter, Dr. Krinochkin contacted Dr. Hanson, the attending physician, to report Decedent's status and to get permission to call a neurosurgeon to examine Decedent. Dr. Hanson approved an urgent neurosurgical consultation. To obtain a neurosurgeon, Dr. Krinochkin contacted Forest Park's operator and told her he "need[ed] a neurosurgeon on-call."

Apparently, Forest Park's operator then attempted to page Dr. Bailey, the neurosurgeon on-call for Forest Park's emergency department. Dr. Bailey had staff privileges at Forest Park. Because Dr. Bailey was going to be unavailable, he had arranged for an associate in his practice group, Dr. Wetherington, to cover for him. Although the on-call schedule noted that the on-call physician was responsible for notifying the medical staff office of any changes, Dr. Bailey did not inform Forest Park of his arrangement with Dr. Wetherington.

Furthermore, when Dr. Bailey asked Dr. Wetherington to cover his calls, he knew Dr. Wetherington did not have staff privileges at Forest Park. Dr. Bailey was also aware that, as a result, if Forest Park contacted Dr. Wetherington to provide emergency neurological services for a patient, Forest Park would have to transfer the patient regardless of the patient's physical condition or the delay associated with the transfer.

Dr. Wetherington responded to the page at approximately 5:45 a.m. Dr. Krinochkin

told Dr. Wetherington that Decedent had fallen and reported the results of her CT scan. Dr. Krinochkin asked Dr. Wetherington to "take a look at [Decedent]." Dr. Wetherington "immediately thought that this patient needs to be evaluated by a neurosurgeon." However, because he lacked staff privileges at Forest Park, he could not treat Decedent there. Accordingly, Dr. Wetherington advised Dr. Krinochkin to transfer Decedent to St. Mary's Hospital ("St.Mary's"), where he had staff privileges, or to St. Louis University Hospital ("SLU").

Dr. Krinochkin called Dr. Hanson and told him that Dr. Wetheringon did not have staff privileges at Forest Park and that he recommended transferring Decedent to either St. Mary's or SLU. Dr. Hanson decided to transfer Decedent to SLU because, *inter alia*, it had neurosurgeons on the premises around the clock.

Dr. Mandis called SLU to arrange for Decedent's transfer. Forest Park's transfer nurse made the final entry on Decedent's chart at 8:30 a.m. Decedent continued to bleed on her brain while awaiting transfer.

Decedent was admitted at SLU at approximately 9:30 a.m. The CT scan taken at Forest Park did not accompany Decedent when she was transferred to SLU. Decedent was taken to the floor and observed. At some point later that morning, Decedent began to deteriorate neurologically. At 11:00 a.m., SLU physicians reversed the anticoagulation effects of Coumadin, a process that had to take place before Decedent would be able to undergo neurosurgery. SLU obtained a second CT scan at 11:57 a.m. Based on the results of the CT scan, a decision was made to take Decedent to surgery. Dr. David Crafts performed an emergency craniotomy at SLU at approximately 2:00 p.m.

Decedent died on July 23, 2002. Decedent's death certificate notes that her cause of death was "pneumonia complicating closed head injury."

Subsequently, Plaintiffs filed a wrongful death action against Dr. Bailey and Defendants. With respect to Dr. Bailey, Plaintiffs alleged, *inter alia*, that Dr. Bailey acted negligently by: (1) delegating his on-call duties to Dr. Wetherington, and (2) failing to notify Forest Park of his decision to assign his on-call duties to Dr. Wetherington. In Dr. Bailey's answer, he requested that the jury apportion the fault to all of the parties, citing section 538.230, RSMo 2000.[23]

On December 10, 2004, the trial court entered an order approving a settlement between Plaintiffs and Forest Park. Plaintiffs dismissed Dr. Krinochkin and Dr. Mandis from the suit prior to trial.

A jury trial took place from January 31 to February 10, 2005 against Dr. Bailey, Dr. Hanson, and Dr. Wetherington. Dr. Bailey made motions for directed verdict at the close of Plaintiffs' evidence and at the close of all the evidence, which the trial court denied. Subsequently, the jury returned a verdict in favor of Plaintiffs in the amount of $400,800, and assessed fifty percent of the fault to Dr. Bailey. The trial court then entered a judgment in accordance with the jury's verdict. Thereafter, Dr. Bailey filed a motion for judgment notwithstanding the verdict or, in the al-

---

2. All statutory references are to RSMo 2000, unless otherwise indicated.

3. Section 538.230 was repealed by H.B. 393, 93rd Gen. Assem., 1st Reg. Sess. (Mo.2005), which took effect on August 28, 2005. Never-

theless, section 538.230 is applicable to the instant case because Plaintiffs filed this case before the effective date. *See State v. Moorhouse*, 181 S.W.3d 621, 623–24 n. 2 (Mo.App. W.D.2006).

ternative, for a new trial, which the trial court denied. This appeal by Dr. Bailey followed.

In his first point on appeal, Dr. Bailey contends that the trial court erred in denying his motion for judgment notwithstanding the verdict because Plaintiffs failed to establish that Dr. Bailey owed a duty of care to Decedent.

 In reviewing a trial court's denial of a motion for judgment notwithstanding the verdict, we must determine whether the plaintiff made a submissible case. *Moore ex rel. Moore v. Bi–State Dev. Agency,* 87 S.W.3d 279, 286 (Mo.App. E.D. 2002). "To make a submissible case, a plaintiff must present substantial evidence for every fact essential to liability." *Id.* We view the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff, and disregard all contrary evidence. *Steele v. Evenflo Co., Inc.,* 178 S.W.3d 715, 717 (Mo.App. E.D. 2005). When reasonable minds can disagree on the questions before the jury, our court may not disturb the jury's verdict. *Id.* We will reverse a jury's verdict only when we find there is a complete absence of probative facts to support it. *Id.* at 717.

 Whether a duty exists is a question of law. *Hallquist v. Midden,* 196 S.W.3d 601, 604 (Mo.App. E.D.2006).

 In order for a plaintiff to make a submissible negligence claim, he must prove the following: (1) the existence of a duty to be performed by the defendant; (2) a breach of that duty; and (3) a resulting injury caused by the breach. *Ladish v. Gordon,* 879 S.W.2d 623, 628 (Mo.App. W.D.1994). A plaintiff can pursue a negligence cause of action against a defendant-physician in two ways: (1) a claim based on medical negligence, also referred to as "medical malpractice," and/or (2) a claim based on general negligence. *See general-*

*ly Millard v. Corrado,* 14 S.W.3d 42, 49, 52 (Mo.App. E.D.1999) (finding that the plaintiffs in that case adequately pleaded both a medical negligence claim and a general negligence claim against the defendant-physician).

 Existing Missouri case law reveals that there are two distinctions between a medical negligence claim and a general negligence claim. *See id.* at 46–47. The first difference between the two claims is that with respect to a medical negligence claim, a physician's allegedly negligent acts or omissions involve a matter of medical science, whereas in a claim for general negligence they do not. *Id.* at 47. The second distinction between a medical negligence claim and a general negligence claim is the source of the physician's duty to the plaintiff. *See id.* at 46–47.

 For a claim based on medical negligence, a physician's duty to a plaintiff is derived from a physician-patient relationship. *Id.* Such a relationship is essential to a claim for medical negligence. *Id.* at 49.

 On the other hand, for a claim based on general negligence, a physician's duty to a plaintiff may exist when public policy favors the recognition of a duty or when the harm to the patient is particularly foreseeable. *Id.* at 47. Thus, a physician-patient relationship is not necessary for a claim for general negligence. *Id.* at 48.

We find that the factual situation and legal analysis articulated in *Millard* pertaining to a general negligence claim is instructive on this point of the appeal.

In *Millard,* Dr. Joseph Corrado ("Dr. Corrado"), a general surgeon, had staff privileges at Audrain Medical Center ("AMC") in Mexico, Missouri. *Id.* at 44. Dr. Corrado was scheduled to be the sur-

geon on call on November 5, 1994. *Id.* Dr. Corrado asked Dr. Ben Jolly ("Dr. Jolly") if he would cover his calls for him during a period of time that day. *Id.* Dr. Jolly agreed to "fill in" for Dr. Corrado even though he did not have privileges to perform general surgery at AMC. *Id.* Dr. Corrado did not inform anyone else at AMC that he was unavailable and, therefore, unable to provide care to emergency room patients requiring general surgery. *Id.*

During the morning of November 5, Marjorie Millard ("Plaintiff Millard") was involved in a severe automobile accident and was transported via ambulance to AMC. *Id.* at 44–45. Plaintiff Millard arrived at AMC at 11:07 a.m. *Id.* at 45. Subsequently, someone at the hospital paged Dr. Corrado twice and he did not respond. *Id.* At 12:08 p.m., Dr. Jolly and another physician, Dr. Thomas Welsh ("Dr.Welsh"), evaluated Plaintiff Millard and concluded that she was bleeding internally and needed surgery. *Id.* But neither physician could perform surgery because they did not have the necessary hospital privileges. *Id.*

At 12:23 p.m., Dr. Corrado called AMC in response to the pages and spoke with Dr. Welsh. *Id.* The two physicians determined that Plaintiff Millard was best served by being transferred to another hospital where a general surgeon would be available to care for her. *Id.* Plaintiff Millard arrived at the other hospital at 1:45 p.m., where she later underwent emergency surgery. *Id.* Plaintiff Millard brought suit against Dr. Corrado alleging negligence and seeking damages for injuries suffered. *Id.* After the trial court granted Dr. Corrado's motion for summary judgment, Plaintiff Millard appealed to our court. *Id.* at 46.

In determining whether public policy supports the existence of a legal duty on Dr. Corrado, we applied and discussed some of the factors enunciated in *Hoover's Dairy, Inc. v. Mid–America Dairymen*, 700 S.W.2d 426, 432 (Mo.banc 1985). *Id.* at 47. These factors discussed in *Millard* included: (1) the economic burden upon the actor and the community; (2) the prevention of future harm; and (3) the foreseeability of harm. *Id.* at 47–48.

With respect to the first factor, we found that "[i]mposing a duty on 'on call' physicians to notify appropriate hospital personnel of their unavailability does not place an unreasonable burden on the medical profession." *Id.* at 47. Pertaining to the second factor, we found that if such a duty is imposed on "on call" physicians, there would be a reduced chance that similar incidents would occur in the future. *Id.*

Finally, with respect to the third factor we found that the risk of harm to which Plaintiff Millard was exposed due to Dr. Corrado's failure to notify AMC of his unavailability was reasonably foreseeable. *Id.* This finding was based in part on the following evidence: (1) Dr. Corrado knew that AMC would have no on-call general surgeon who could provide treatment during his absence; (2) Dr. Corrado's attempt to delegate his on-call duties to Dr. Jolly was conclusively ineffective because Dr. Jolly did not have privileges at AMC to perform general surgery; and (3) Dr. Corrado's failure to notify AMC of his unavailability created a false sense of security that a general surgeon would be available on-call to care for emergency patients requiring a general surgeon within a reasonable time at AMC. *Id.* at 48.

Ultimately, we held that under a general negligence claim:

> 'on call' physicians owe a duty to reasonably foreseeable emergency patients to provide reasonable notice to appropriate hospital personnel when they will be un-

available to respond to calls .... Physicians who cannot fulfill their 'on call' responsibilities must provide notice as soon as practicable once they learn of circumstances that will render them unavailable. *Id.* at 48.

■ In this case, we initially note that because the verdict directing instruction pertaining to Dr. Bailey references Dr. Bailey's negligent conduct as: failing to be available to provide on-call neurosurgical services for Decedent; knowing Dr. Wetherington did not have staff privileges at Forest Park to provide neurosurgical services; or failing to notify Forest Park of his decision to assign his on-call duties to Dr. Wetherington, we find Plaintiffs' adequately submitted this case to the jury based on a claim for general negligence.

■ The facts in the instant case are very similar to the facts in *Millard.* Dr. Bailey, a neurosurgeon, had staff privileges at Forest Park. Dr. Bailey was scheduled to be the neurosurgeon on call for the "emergency department" at Forest Park during the timeframe that Decedent was in the hospital. Dr. Bailey arranged for another physician, Dr. Wetherington, to cover his calls for him during that time. In addition, Dr. Bailey did not inform the appropriate personnel at Forest Park that he was unavailable or of this arrangement, despite the fact that the on-call schedule noted that Dr. Bailey was responsible for notifying the medical staff office of any changes.

On July 5, 2002, Decedent arrived at the emergency room at Forest Park and she was thereafter admitted to the hospital. After Decedent suffered a fall in the early morning hours of July 7, a CT scan of Decedent's head revealed that she was suffering from an epidural hematoma and subarachnoid bleed. This was an urgent situation that required the attention of a neurosurgeon right away. Sometime between 4:45 a.m. and 5:45 a.m., Dr. Krinochkin contacted Forest Park's operator and told her he "need[ed] a neurosurgeon on-call."

At 5:45 a.m., Dr. Wetheringon, in accordance with his arrangement with Dr. Bailey, responded to the page. After hearing Decedent's status, Dr. Wetherington "immediately thought that this patient needs to be evaluated by a neurosurgeon." But because Dr. Wetherington lacked privileges at Forest Park, he could not treat Decedent there. He recommended that Decedent be transferred to another hospital. Dr. Hanson decided to transfer Decedent to SLU.

Decedent arrived at SLU at 9:30 a.m., where she subsequently began to deteriorate neurologically. Decedent underwent an emergency craniotomy at SLU at approximately 2:00 p.m., and died approximately two weeks later.

Because we find *Millard* is applicable to the instant case, Dr. Bailey, as the "on call" physician for Forest Park's "emergency department," owed a duty to reasonably foreseeable emergency patients to provide reasonable notice to Forest Park personnel that he would be unavailable to respond to calls.

Dr. Bailey maintains that he did not owe a duty to Decedent because she was not a reasonably foreseeable emergency patient. Dr. Bailey contends that because the on-call schedule is for the "emergency *department,*" he owed a duty to provide emergency neurological care to patients in the emergency room itself, but did not owe a duty to Decedent because she needed emergency neurological care after she was admitted to the hospital. The evidence shows that Decedent's condition was an urgent, emergency situation. Additionally, Brian Frist, M.D. ("Dr. Frist") opined that by agreeing to serve as the on-call neurolo-

gist at Forest Park, Dr. Bailey accepted responsibility "for all patients in that facility that are in need of his specialty." Based on this evidence, we find Decedent was a reasonably foreseeable emergency patient.

Moreover, the risk of harm to which Decedent was exposed due to Dr. Bailey's failure to notify Forest Park of his unavailability was also reasonably foreseeable. Dr. Bailey's attempt to delegate his duty to Dr. Wetherington was conclusively ineffective because Dr. Bailey knew that Dr. Wetherington did not have staff privileges at Forest Park. Dr. Bailey was also aware that, as a result, if Forest Park contacted Dr. Wetherington to provide emergency neurological services for a patient, the patient would have to be transferred regardless of the patient's physical condition or the delay associated with the transfer. Thus, Dr. Bailey, like Dr. Corrado in *Millard*, knew that Forest Park would have no on-call neurological surgeon who could provide treatment during his absence.

Under Plaintiffs' general negligence claim, Dr. Bailey owed a duty to Decedent to provide reasonable notice to personnel at Forest Park that he would be unavailable to respond to calls. Thus, it is unnecessary for us to determine whether Dr. Bailey also owed a duty to Decedent by virtue of a physician-patient relationship. Point denied.

In his second point on appeal, Dr. Bailey argues that the trial court erred in denying his motion for judgment notwithstanding the verdict because Plaintiffs failed to establish causation in fact.

We review under the same standard of review as discussed above in the first point on appeal.

■ In order for a plaintiff to make a submissible negligence claim, he or she must prove the existence of a duty to be performed by the defendant, a breach of that duty, and a resulting injury caused by the breach. *Ladish*, 879 S.W.2d at 628. To establish causation, the plaintiff must prove that the defendant's conduct is both the cause in fact and the proximate cause of a plaintiff's resulting injury. *Heffernan v. Reinhold*, 73 S.W.3d 659, 664 (Mo.App. E.D.2002). To prove causation in fact in a wrongful death action, a plaintiff must establish that "but for" defendant's acts or omissions, the decedent would not have died. *Baker v. Guzon*, 950 S.W.2d 635, 644 (Mo.App. E.D.1997). In a case involving the negligence of a physician, causation in fact is established when an expert's opinion is expressed in terms of "reasonable medical certainty." *Wicklund v. Handoyo*, 181 S.W.3d 143, 150 (Mo.App. E.D.2005) (emphasis omitted).

Under *Millard*, Dr. Corrado's failure to be present to treat Plaintiff Millard was an "ongoing tort." 14 S.W.3d at 52. The court concluded that Dr. Corrado's duty to Plaintiff Millard "arose upon her admission to the emergency room and continued until she received the emergency surgery she needed." *Id.* Although this analysis was in the context of our discussion of Plaintiff Millard's medical negligence claim, we believe this analysis is applicable to Plaintiffs' general negligence claim in the instant case.

■ In this case, Dr. Bailey contends that Plaintiffs failed to establish that "but for" Dr. Bailey's failure to notify Forest Park of his unavailability, Decedent would not have died. But because of Dr. Bailey's failure to notify Forest Park of his unavailability and failure to arrange for a qualified neurosurgeon to cover his calls, no neurosurgeon was available to treat Decedent at Forest Park. Dr. Bailey's conduct, like Dr. Corrado's conduct in *Millard*, was an ongoing tort. Similarly, Dr. Bailey's duty to Decedent arose upon her need for

emergency neurological care and continued until she received the emergency neurological care she needed, which ultimately in this case was an emergency craniotomy.

Dr. Bailey testified that he performed craniotomies at Forest Park, like the one Decedent required, "[w]hen available." Walter Lemann, M.D. ("Dr. Lemann") opined within reasonable medical certainty that Decedent would have survived if a craniotomy would have been performed between the hours of 5:30 a.m. and 9:30 a.m. We find this constitutes substantial evidence that Decedent would have survived if a qualified on-call neurosurgeon, either Dr. Bailey himself or a neurosurgeon Dr. Bailey had arranged to cover his calls, had been "available" at the time Decedent required emergency neurological care.

Therefore, because there is substantial evidence that "but for" Dr. Bailey's conduct Decedent would not have died, Plaintiffs established causation in fact. Point denied.

In his third point on appeal, Dr. Bailey asserts that the trial court erred in denying his motion for judgment notwithstanding the verdict because Plaintiffs failed to establish Dr. Bailey deviated from the standard of care.

We review under the same standard of review as discussed above in the first point on appeal.

■■■■ In order for a plaintiff to make a submissible negligence claim against a defendant-physician, he must prove the physician "failed to exercise that degree of skill and learning ordinarily exercised by members of his profession under the same or similar circumstances." *Ladish*, 879 S.W.2d at 628; *see* MAI 11.06.

It is not necessary that the legal standard be recited in ritualistic fashion, but generally it must appear somewhere in the context of the expert's testimony that the proper objective legal standard is the standard being employed by this expert in his or her testimony. *Ladish*, 879 S.W.2d at 634.

■■■■ What is necessary is that the trier of fact must be informed that the expert, in offering his opinions, is using the prescribed legal standard, as opposed to some other standard. *Id.* An expert's responses to questions posed by plaintiff's counsel may effectively establish the requisite standard of care. *Yoos v. Jewish Hosp. of St. Louis*, 645 S.W.2d 177, 184 (Mo.App. E.D.1982).

In *Ladish*, the plaintiff failed to establish the standard of care when the expert merely told the jury that the defendant-physician's conduct fell "below the standard of care," and "it might have been more appropriate" for the defendant to have done something else. 879 S.W.2d at 633, 635. In contrast, in *Wicklund*, this court held that the plaintiff established the standard of care, "albeit imperfectly," when the expert testified: "[T]he strict definition of standard of care is what a reasonable and prudent physician would do in similar circumstances. What I think that standard of care really means is what's sensible care, what's good for the patient." 181 S.W.3d at 148, 147.

■■■ In this case, Dr. Lemann testified to the following at trial:

[Plaintiffs' counsel]: Do you have any criticisms of Doctor Bailey based upon your review of all of the material and your experience and learning within reasonable medical certainty?

[Dr. Lemann]: Well, I think the criticism of Doctor Bailey relates to the issue of accepting the obligation of being the neurosurgical provider for the hospital as based on th[e] call schedule and then having delegated

that to an imperfect agent, if you will, someone who couldn't fulfill that obligation for him, and he, at least, should have been able to foresee the fact that that would be a problem. I mean, we have a similar problem that we've dealt with in our practice ... [Dr. Lemann then described the problem within his own practice].

[Plaintiffs' counsel]: If I understand you then at all times material you make sure that the doctor on-call can cover the hospital for which he is on-call.

[Dr. Lemann]: Absolutely.

[Plaintiffs' counsel]: And do you feel that Doctor Bailey did not exercise the degree of skill and learning ordinarily exercised under the circumstances by members of his profession within reasonable medical certainty when he failed to be available himself to respond to an emergency call on July 7, 2002 for [Decedent]?

[Dr. Bailey's counsel]: Objection, foundation, Your Honor.

The Court: Overruled.

[Dr. Lemann]: I do.

[Plaintiffs' counsel]: What is that opinion?

[Dr. Lemann]: That it was a failure to exercise those matters.

We find that Dr. Lemann's expert testimony, through his responses to questions posed by Plaintiffs' counsel, collectively establishes the requisite standard of care in this case. Dr. Lemann's testimony is remarkably different from the testimony of the expert in *Ladish*, and more adequately describes the standard of care than the testimony of the expert in *Wicklund*. Although we recognize that Dr. Lemann's testimony is imperfect, a juror could reasonably conclude from it that Dr. Bailey, through his conduct, failed to exercise that degree of skill and learning ordinarily ex-

ercised by members of his profession under the same or similar circumstances.

Therefore, Plaintiffs established the requisite standard of care. Point denied.

In his fourth point on appeal, Dr. Bailey maintains that the jury was improperly instructed. Specifically, Dr. Bailey argues the trial court erred by: (1) failing to add Forest Park, as a released party under section 538.230.1, to the verdict form for purposes of apportionment of fault; and (2) refusing to submit Instruction A to the jury, which would have allowed the jury to apportion fault to Forest Park.

■■■■ The question of whether a jury was properly instructed presents a question of law, which we review de novo. *Wicklund*, 181 S.W.3d at 151. Our review of a trial court's refusal to submit an instruction to the jury is for abuse of discretion. *City of Sullivan v. Truckstop Restaurants*, 142 S.W.3d 181, 197 (Mo.App. E.D.2004).

Section 538.230.1 provides in pertinent part:

> In any action against a health care provider for damages for personal injury or death on account of the rendering of or failure to render health care services where fault is apportioned among the parties and persons released pursuant to [section 538.230.3], *the court, unless otherwise agreed by all the parties, shall instruct the jury to apportion fault among such persons and parties* ....
> Section 538.230.1 (emphasis added).

Section 538.230.3 defines a "release" as "[a]ny release, covenant not to sue, or similar agreement entered into by a claimant and a person or entity against which a claim is asserted arising out of the alleged transaction which is the basis for plaintiff's cause of action." Section 538.230.3.

■■■ One would reason from reading section 538.230.1 alone that it always re-

quires a trial court, unless otherwise agreed by all the parties, to instruct the jury to apportion fault to a released party by adding the released party to the verdict form. But section 538.230.1 cannot be read in isolation because a released party can only be listed on a verdict form for purposes of apportionment of fault if accompanied by an appropriate verdict directing instruction applicable to that released party. *See* MAI 36.22, Notes on Use 3.[4] A verdict directing instruction is appropriate and should only be submitted by the trial court when it is supported by substantial evidence. *See Sheehan v. Northwestern Mut. Life Ins. Co.,* 103 S.W.3d 121, 127 (Mo.App. E.D.2002) (holding that a verdict directing instruction is erroneous if it is not supported by the evidence); *City of Sullivan,* 142 S.W.3d at 197 (finding that a proffered instruction must be supported by substantial evidence). "The burden of proof and the responsibility to tender such a verdict director is on the party seeking an assessment of a percentage of fault to a released person." MAI 36.22, Notes on Use 3.

■ Because the trial court entered an order approving settlement between Plaintiffs and Forest Park prior to trial, Forest Park is a released party within the meaning of sections 538.230.3 and 538.230.1. As discussed above, in order to establish whether the trial court erred by not listing Forest Park on the verdict form for purposes of apportionment of fault, we must determine whether Dr. Bailey met his burden of proof in tendering a verdict directing instruction that was supported by substantial evidence.

■ Substantial evidence is "evidence which, if true, is probative of the issues and from which the jury can decide the case." *City of Sullivan,* 142 S.W.3d at 197. When reviewing whether a submitted instruction is supported by substantial evidence, we view the evidence and reasonable inferences therefrom in the light most favorable to the instruction, and disregard any contrary evidence. *Id.*

Dr. Bailey's proffered verdict director, Instruction A, provides:

If you assess a percentage of fault to [Dr. Hanson], under Instruction No. 7, [Dr. Bailey], under Instruction No. 9, or [Dr. Wetherington] under Instruction No. 11, then you must assess a percentage of fault to [Forest Park] on defendants' claim that [Forest Park] is partly at fault if you believe:

First, [Forest Park] failed to have a contingency plan or transfer arrangement in the event the on-call neurosurgeon was not available, and

Second, [Forest Park] was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause the death of [Decedent].

The only evidence presented at trial as to whether Forest Park failed to have a contingency plan or transfer arrangement in the event the on-call neurosurgeon was not available was the following: (1) the on-call schedule only named one on-call neurosurgeon, Dr. Bailey, and did not name a second on-call neurosurgeon; (2) Andrew Zelby, M.D. opined that naming a backup on-call neurosurgeon was typical protocol and that a hospital is obligated to have a

---

**4.** MAI 36.22 is the verdict form for actions against health care providers involving a plaintiff and single or multiple defendants and a submission of comparative fault. MAI does not contemplate a verdict form for a plaintiff's action against health care providers, apportionment of fault among multiple defendants, and no submission of comparative fault on the part of the plaintiff. *See Pickel v. Gaskin,* 202 S.W.3d 630, 635 (Mo. App.E.D., 2006).

contingency plan for a transfer; and (3) Daniel Scodary, M.D. opined that it was inappropriate for Forest Park to fail to name a backup on-call neurosurgeon. We find that this does not constitute substantial evidence that Forest Park failed to have a contingency plan in the event that the on-call neurosurgeon was not available, especially because the on-call schedule provided that "[i]t is the physicians' responsibility to arrange alternate coverage [and] notify the [m]edical [s]taff [o]ffice of any changes," and in this case Dr. Bailey did not arrange alternate coverage or notify Forest Park that he would be unavailable.

Furthermore, there was no evidence presented establishing that Forest Park failed to have a transfer arrangement in the event that the on-call neurosurgeon was not available. Here, the on-call neurosurgeon, Dr. Bailey, was not available. But after learning that Dr. Bailey's associate, Dr. Wetherington, could not treat Decedent, Forest Park arranged for Decedent's transfer to SLU and Decedent was in fact transferred to SLU. Accordingly, Forest Park had a transfer arrangement when the on-call neurosurgeon, Dr. Bailey, was not available.

Thus, the trial court did not err by refusing to submit Instruction A to the jury because it is not supported by substantial evidence. In addition, because the verdict form was not accompanied by an appropriate verdict directing instruction applicable to Forest Park, the trial court also did not err by failing to add Forest Park to the verdict form for purposes of apportionment of fault. Point denied.

In his fifth point on appeal, Dr. Bailey contends that the trial court erred in denying his motion for mistrial when evidence of Dr. Bailey's prior litigation was injected at trial.

■ "A mistrial is a drastic remedy, and the decision to grant one for mis-

conduct or the introduction of prejudicial evidence is largely within the discretion of the trial court." *Cole v. Warren County R–III School Dist.*, 23 S.W.3d 756, 759 (Mo.App. E.D.2000). The trial court is in a better position to assess the prejudicial effect of improper evidence on the jury and to evaluate whether any resulting prejudice can be cured by less drastic means than granting a mistrial. *Id.* Our court will reverse a trial court's denial of a motion for mistrial only when there has been a manifest abuse of discretion. *Id.* To establish manifest abuse of discretion, an error must be of such a grievous nature that prejudice cannot otherwise be removed. *Id.*

■ In this case, the trial court granted a motion in limine to exclude evidence of any prior litigation involving Dr. Bailey. Nonetheless, the following exchanges took place during trial:

[Plaintiff's counsel]: And Doctor Scodary testified on your behalf in the Montgomery case?

[Dr. Bailey]: I don't know anything about that case.

[Plaintiff's counsel]: You don't remember the Montgomery case?

[Dr. Bailey]: I do not.

[Plaintiff's counsel]: Do you remember Montgomery versus you?

At this point, Dr. Bailey's counsel moved for a mistrial, which the trial court denied. For curative relief, Dr. Bailey's counsel asked the court to strike the last question and answer, instruct the jury to disregard those statements, and admonish counsel. The trial court instructed the jury that the last question and answer were to be stricken from the record and disregarded, but did not admonish counsel.

■ The elicitation of the above testimony was in direct conflict with the trial court's ruling on the motion in limine, which is improper. *See Cole*, 23 S.W.3d at 759. Although the trial court did not ad-

monish counsel, the trial court instructed the jury that the last question and answer were to be stricken from the record and disregarded. Through these actions, the trial court effectively determined that any prejudice from the improper elicitation of evidence could be cured by less drastic means than granting a mistrial. Moreover, we presume that the jury follows the court's instructions. *Id.* Therefore, we find that the trial court's denial of a mistrial does not rise to the level of manifest abuse of discretion. Point denied.

Based on the foregoing, the judgment of the trial court is affirmed.

GEORGE W. DRAPER, III and KENNETH M. ROMINES, JJ., Concur.